W. P. GARTH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CLARA LOUISE GARTH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3724–68, 3725–68. Filed June 23, 1971.

*J. Kearney Dossett* and *Charles L. Brocato*, for the petitioners.
*Robert D. Hoffman*, for the respondent.

---

DRENNEN, *Judge:* Respondent asserted transferee liability against petitioners as transferees of the assets of Garth's Poultry & Egg Service, Inc. (hereinafter referred to as Garth's), for a deficiency of $155,-707.78 in income tax and an addition to tax of $38,927.20 under section 6651(a), I.R.C. 1954,[1] for Garth's taxable period ended May 31, 1962.

The issues for our decision herein are as follows: (1) Whether Garth's flocks of laying hens were properly includable in inventory; if so, (2) whether Garth's use of the farm-price method of valuing its pullet and laying-hen flock inventories clearly reflected its income; (3) whether the late filing of Garth's income tax return for its taxable year ended May 31, 1962, was due to reasonable cause or willful neglect; and (4) whether petitioners are liable as transferees for any unpaid income tax liability and addition to tax of Garth's for its taxable period November 1, 1961, to May 31, 1962.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners are husband and wife and resided in Jackson, Miss., at the time they filed their petitions herein.[2]

Garth's, a Mississippi corporation, was engaged, along with four other related corporations and a sole proprietorship, in an integrated chicken and egg production and sales operation. It was incorporated on February 27, 1956, with its principal office being located in Pelahatchie, Miss. During its existence it operated on a fiscal year ending October 31. It employed the accrual method of accounting in keeping its books and records and in preparing its Federal corporation income tax returns. For each of the years of its existence it filed its Federal corporation income tax return with the district director of internal revenue, Jackson, Miss.

The capital stock of Garth's was owned at all times during its existence by petitioners as follows:

|  | Number of shares |
|---|---|
| W. P. Garth | 38 |
| Clara Louise Garth | 37 |
| Total | 75 |

Garth's purchased, raised, and held chickens primarily for the production and sale of eggs. It acquired pullets from Garth's Hatchery, Inc., a related corporation owned by petitioners, as day-old chicks. These pullets were placed in pullet flock houses and ranges where they

---

[1] All statutory references are to the Internal Revenue Code of 1954.

[2] Separate notices of transferee liability were mailed to petitioners, who both filed petitions herein disrupting respondent's determination. The cases have been consolidated for purposes of trial and opinion.

were cared for, fed, and given the proper medication. Some of these flocks were placed in facilities owned by Garth's and were cared for by its employees. The remainder were placed in facilities owned by others. In the latter instance, Garth's furnished the bird, the feed and medication and other direct expenses, while labor was furnished on a contract basis by others. Garth's, through its employees, had full control of and exercised supervision of the flocks and the facilities, both Garth's and others, seeing that the proper feed and medication was given and that proper sanitation conditions were met. The supervisory employees decided when the flocks were placed in and were taken out of the pullet houses and ranges.

When the pullets were approximately ready to begin laying, Garth's removed them from the pullet flock houses and ranges and placed them in laying houses. Here again, some flocks were placed in facilities owned by Garth's whereas others were placed in other facilities. The labor for caring for these flocks and gathering the eggs was performed by company employees in those facilities owned by Garth's and by contract labor in the other houses, those laborers receiving a compensation based upon production. Garth's owned the flocks and furnished all feed, medication, and other direct expenses. Garths' employees exercised full and detailed supervision of all flocks, deciding how much feed and medication would be given, seeing that proper sanitation was maintained, and deciding when the hens would be moved from the facility and when and where and for what prices the eggs and hens would be sold.

In the egg-production business a pullet is a female chicken which has not reached 50-percent production. A chicken becomes a laying hen when she is 24 to 26 weeks of age. At such age these birds produce approximately one egg every other day which is termed 50-percent production. Flocks of pullets are placed in laying houses from 18 to 20 weeks of age to permit the birds to become acclimated to the new environment and conditions and also so that they will become accustomed to laying in controlled nests rather than on the floor, in the ceilings, etc. During the period of time from age 18 to 20 weeks, when placed in laying houses, until they reach the age of 24 to 26 weeks, the eggs produced, while sold, are not considered to be commercially marketable.

Chickens are very unstable creatures and their longevity and productivity are continually being affected by disease and environmental factors such as heating, humidity, light, and sound. Longevity, productivity, and laying characteristics vary from breed to breed and from strain to strain within the breeds of chickens. Generally, the normal laying cycle of a flock of laying hens is considered to be approximately 12 months from the time they become laying hens. This 12-month

period is the average laying cycle of the flock as a whole and does not take into consideration the mortality of the individual birds within the flock. In the poultry business the rule of thumb is that 20 percent of the birds in each laying flock will die from the time the flock begins production until the time the flock is sold.

The laying hens are sold when the flock has dropped in production and it becomes unprofitable to maintain the hens as a laying flock. Dependent upon egg prices, mortality, and other such factors, the time that laying flocks are sold might vary several months from flock to flock. There is an active market for the purchase of these birds, and they are sold to the highest bidder at the point in time when it is determined the flock should be sold. The birds are intended for ultimate sale from the time they are transferred into the laying flocks. All of the sales of chickens by Garth's were to meat-processing plants in Mississippi and Tennessee.

There is only a very limited market for any quantity of chickens from the time they are 1 day old until they are considered started pullets at approximately 20 weeks of age. A market does exist, however, for started pullets with those farmers in the started-pullet business selling them on a contract basis for future delivery. Garth's was not in that business and at no time sold any of its started pullets. After the chickens are moved to the laying houses, there is no market for them other than to meat-processing plants since any sudden change or move will cause the laying hens to stop laying eggs.

Prior to October 31, 1961, Garth's inventoried its chickens (pullets and laying hens) on both its books and records and on its Federal corporation income tax returns. Thereon the flock inventories were valued at the price for which the flocks could be sold on the relevant dates to meat-processing plants. The flock inventories were determined at the end of each year by physical count with adjustments being made on the books and records through the cost of goods sold account to reflect the increase or decrease in the poultry flock inventory for each particular year. The actual costs accrued each year in purchasing, raising, and caring for the chickens were expensed and deducted currently.

On March 23, 1962, Garth's, along with the other related corporations in the integrated poultry operation, executed a plan and agreement of reorganization with Ralston Purina Co. whereby Ralston Purina or Garth Enterprises, Inc., a subsidiary to be formed by Ralston Purina, was to acquire all of the assets, subject to liabilities, of Garth's and the other related corporations solely in exchange for shares of Ralston Purina stock. The plan and agreement of reorganization stated that it was "made and entered into, as of the 30th day of September, 1961," pursuant to which the number of shares of Ralston Purina stock exchanged for the net assets of each of the selling

corporations was determined by dividing the net value of the assets on September 30, 1961, as determined by negotiation, by the average selling price of Ralston Purina's stock during the month of September 1961.

Under the plan and agreement of reorganization any net increase in assets from October 1, 1961, to the date of closing was to inure to the benefit of Ralston Purina. Special provision was made, however, for the payment of taxes for the period from October 1, 1961, to the date of closing. Such provision was as follows:

The liabilities so assumed by Purina or its subsidiary shall exclude:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) All liabilities for federal or state income taxes for any tax period prior to closing date, provided, however, that there may be deducted from the said assets to be transferred to Purina or its subsidiary in accordance with Paragraph 13 an amount equal to the income tax liability of each of Sellers on account of additional income of each of Sellers for the period of from October 1, 1961, to closing date, said amount not to be affected, however, on account of any changes or revisions or additions which might be made by taxing authorities for said period or for any other prior period, any such changes or revisions being the responsibility of Sellers or their distributees in liquidation, such amount so deducted from said assets shall not be transferred to Purina. Any change or revision arising solely on account of the manner or operation of Seller's business since October 1, 1961, and at the behest of Purina shall be the responsibility of Purina. It is further understood and agreed that the liabilities assumed by Purina do not include in any wise any federal or state income tax, which might be due for any period prior to September 30, 1961, whether such tax for any period prior to September 30, 1961, may have been ascertained or may hereafter be due on account of adjustments, or audits, or other revisions by taxing authorities, any such additional tax being the sole responsibility of Sellers or their distributees in liquidation. Any federal or state income tax refund for any period prior to October 1, 1961, shall be the property of Sellers and shall not be transferred to Purina.

The plan and agreement of reorganization was amended by letter agreement dated June 1, 1962, regarding Federal and State income taxes applicable to the operations of the selling corporations from October, 1, 1961, through June 1, 1962, as follows:

Inasmuch as the Plan and Agreement of Reorganization dated March 23, 1962, between the above mentioned corporations and Ralston Purina Company provides that upon the consummation of the transaction contemplated thereunder, the said corporations may deduct from the assets transferred the amount which might be due on account of income taxes of the said corporations on account of operations from October 1, 1961, forward, and since this transaction is being closed on June 1, 1962, and said amounts are at the moment unascertainable, you have decided to simply transfer all assets held by the corporations to Ralston Purina Company and have done so on this date.

Ralston Purina will, however, when advised of the amount of the additional tax due on account of said operations, refund to each corporation the amount which might be due it which will equal any tax which it has to pay. This relates to federal and state income taxes.

You will, however, submit said returns to us for our examination and approval of the amount prior to filing same and prior to our refunding any amount to you.

On June 1, 1962, the closing date of the reorganization, Ralston Purina transferred 17,324 shares of its capital stock to Garth's in exchange for all of Garth's assets, subject to liabilities, as of that date. The assets and liabilities of Garth's were transferred to Garth Enterprises, Inc., a subsidiary formed by Ralston Purina. Garth's distributed the 17,324 shares of Ralston Purina stock to petitioners in complete liquidation. It dissolved on July 9, 1962. The Ralston Purina shares were distributed as follows:

| Distributee | Number of shares |
|---|---|
| W. P. Garth | 8,777 |
| Clara Louise Garth | 8,547 |
| Total | 17,324 |

As of October 1, 1961, Ralston Purina assumed control of the management, policies, and procedures, including accounting practices and procedures and approval of all income tax returns, of all of the selling corporations. Also as of October 1, 1961, petitioner W. P. Garth was employed by Ralston Purina to manage the operations of Garth's.

After September 30, 1961, no separate books and records were maintained for the various corporations (including Garth's) covered by the plan and agreement of reorganization; the operations of those corporations together with the operations of a milling company, a sole proprietorship owned by petitioner W. P. Garth which produced the feed which was sold to the various corporations for use in feeding their flocks of chickens, were combined and carried on as one operation under the designation Garth Enterprises, Inc., with the records being maintained as one entity. The records were departmentalized so that to some extent the departmental records reflected the operation of the various entities.

The poultry flock inventories reflected on the books and records designated as Garth Enterprises, Inc., subsequent to September 30, 1961, were determined as follows:

A. *Commercial pullet flock values.*—The beginning value was set up at the value which was assigned to these flocks for determining the basis upon which Ralston Purina stock was to be issued in the reorganization. There was added to the above beginning figure the cost of additional birds acquired, labor costs, medication, sanitation expenses, feed costs, overhead costs, including overhead of the mill and farm, and other miscellaneous expenses. Feed was charged to the flock at the value when delivered. From the sum of the above there was deducted the book value of pullets which died and the book value of pullets which were transferred to laying flocks. The net remainder of the above constituted the book value at any specific date. Computa-

tions were made and the inventory balances determined at the end of each month. These balances were entered in a general ledger monthly.

B. *Commercial laying hen values.*—The beginning value was determined in the same manner as above. To this beginning value there was added a valuation of new hens taken into the flocks, that valuation being $1.77 per hen for the period October 1, 1961, to April 30, 1962, and $1.50 per hen during the month of May 1962. The sum of the above was then reduced by deducting the book value of hens which died or were sold, and by reduction in value of the flocks at 13 cents per bird per month for 9 months and at 14 cents per bird per month for the remaining months down to a salvage value of 32 cents per hen. For each of these months except May, the hen valuation set up exceeded the book value shown for the pullets transferred, resulting in the inventory valuation on the books at May 31, 1962, being greater than cost.

On December 15, 1961, Garth's filed a Federal corporation income tax return labeled "Final Return" for the period ended September 30, 1961. On May 12, 1964, Garth's filed an amended Federal corporation income tax return for its taxable year ended October 31, 1961, and also filed its Federal corporation income tax return for the period November 1, 1961, to May 31, 1962, which was labeled "Final Return." The plan and agreement of reorganization was attached to the return for the period ended May 31, 1962. The return for the period ended May 31, 1962, reflected a loss of $244,064.72.[3]

All of the above-mentioned returns were prepared and filed using the accrual method of accounting with flock inventories being valued at the price for which the flocks could be sold on the relevant dates to meat-processing plants. This method was consistent with the method used by Garth's in its prior Federal corporation income tax returns and the method employed by it on its books and records prior to October 1, 1961.

The poultry flock inventories shown on the income tax returns of Garth's for the periods ending October 31, 1961, and May 31, 1962, consisted of the following:

| Period ending | Number of birds | Valuation |
|---|---|---|
| Oct. 31, 1961 | 684, 619 | $171, 693. 32 |
| May 31, 1962 | 798, 591 | 223, 605. 48 |

These valuations were the market prices at which the chickens could have been sold to meat-processing plants on the respective dates.

[3] Garth Enterprises, Inc., filed claims for refund as transferee of Garth's in which Garth Enterprises, Inc., claimed a net operating loss deduction in the income tax returns of Garth's for its taxable years ended Oct. 31, 1960, and Oct. 31, 1961, arising from the carryback of the net operating loss shown on the return of Garth's for the period Nov. 1, 1961, to May 31, 1962.

All of the books of account of Garth's for periods prior to October 1, 1961, were destroyed in a fire in the office of Garth Enterprises, Inc., the subsidiary of Ralston Purina, in November 1963. The books and records designated as Garth Enterprises, Inc., reflected the following number of chickens and book values on the date indicated:

| Date | Number of birds | Book value |
|---|---|---|
| Oct. 1, 1961 | 676, 076 | $659, 380. 39 |
| Oct. 31, 1961 | 684, 619 | 650, 020. 28 |
| May 31, 1962 | 798, 591 | 777, 685. 16 |

These values were arrived at by the method previously described.

In the separate statutory notices of transferee liability mailed to petitioners, respondent determined that the method of poultry flock inventory valuation utilized by Garth's on its income tax return for the period ended May 31, 1962, did not clearly reflect income, that the cost accounting method used on the books and records of Garth's (the records designated Garth Enterprises, Inc.) for that period did correctly reflect the value of the poultry flock inventories, and that Garth's had changed its method of accounting for a material item with the result that the provisions of section 481(a) applied.

In the early 1960's poultry valuation methods and accounting methods in general utilized by poultry and egg businesses were in a state of flux with no one generally recognized method of accounting or of poultry flock valuation existing. The method of poultry flock inventory valuation used by Garth's in its income tax return for the period ending May 31, 1962, and in its returns for prior years, was also being used by other poultry and egg businesses in the State of Mississippi, and was a generally accepted method of inventory valuation in the poultry and egg farming trade. This method, when consistently used, clearly reflected Garth's income.

The method of accounting used on the books and records designated "Garth Enterprises, Inc.," and found by respondent to be the correct method of accounting for poultry flocks was used by Ralston Purina in that form for the first time in late 1961.

### OPINION

The primary issue before us involves the question of how the costs incurred in purchasing, raising, and caring for chickens (pullets and laying hens) held primarily for the production and sale of eggs should be treated in determining cost of goods sold for Federal income tax purposes.

The situation surrounding this controversy is somewhat confused in light of the reorganization between Ralston Purina and Garth's. During the year at issue Ralston Purina had taken over the operations

and accounting records of Garth's, utilizing the method of accounting for the poultry flocks advocated by respondent herein. Garth's, however, filed its income tax return for its fiscal year ended May 31, 1962, on the same basis on which it had computed taxable income in the past, i.e., inventorying the chickens and valuing them at the price at which they could be sold to meat-processing plants.

Since Garth's is the taxable entity involved herein, not Ralston Purina, we have not given any weight to the fact that the books and records designated as Garth Enterprises, Inc., did utilize the method of accounting for treating poultry flocks that respondent has determined to be the proper method. As we view the facts, Ralston Purina used this method for its own internal purposes and it cannot be attributed to Garth's. See *Patchen* v. *Commissioner*, 258 F. 2d 544 (C.A. 5, 1958), affirming in part and reversing in part 27 T.C. 592.

Respondent contends that the chickens should be viewed as self-constructed production equipment ("egg-making machines") and therefore the initial purchase price plus the costs of raising the chickens until they reach 26 weeks of age (the age at which chickens normally begin to produce commercially salable eggs) should be capitalized and amortized down to salvage value over the productive life of the chickens. Respondent further contends that he is authorized under section 446 [4] to require Garth's to compute its income under this method inasmuch as its method of inventorying the chickens and valuing them at the price for which they could be sold to meat-processing plants does not clearly reflect income.

It is well settled that the Commissioner has broad powers in determining whether the accounting method used by a taxpayer does clearly reflect income, *Commissioner* v. *Hansen*, 360 U.S. 446, 467; but this is not to say that the Commissioner has authority to force a taxpayer to change from a method of accounting which does "clearly reflect income" to a method which in the Commissioner's opinion more clearly reflects income. "It is not the province of the court to weigh and determine the relative merits of systems of accounting." *Brown* v. *Helvering*, 291 U.S. 193 (1934). [5]

While the phrase "clearly reflect income" is not defined in the Internal Revenue Code nor the regulations promulgated thereunder, "it is evident that what method will or will not clearly reflect income must vary greatly from business to business and from factual situation to

[4] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.
(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.
(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[5] See *Koebig & Koebig, Inc.*, T.C.Memo. 1964–32.

factual situation." *Sam W. Emerson Co.,* 37 T.C. 1063, 1067 (1962). Thus, we must determine if the method of accounting used by Garth's concerning the treatment of its chickens does clearly reflect income in light of the particular facts and circumstances existing in the poultry business. Ordinarily, if a method of accounting which is in accordance with generally accepted accounting principles and the accepted accounting practices and customs of the particular trade or business is used consistently, it will be regarded as clearly reflecting income. Sec. 1.446–1(a)(2), Income Tax Regs.; *Jud Plumbing & Heating, Inc.,* 5 T.C. 127, 134 (1945), affd. 153 F. 2d 681 (C.A. 5, 1946); *Sam W. Emerson Co., supra.*

We think the crux of this issue revolves around the question of whether the particular type of property involved herein (chickens) is the type of property which can be inventoried. If it is, we must then determine if the method of inventory valuation used by Garth's was in accordance with generally accepted accounting principles and the accepted accounting practices and customs of the poultry business, and clearly reflected income.

At the outset, we think it beyond dispute that Garth's was a farming corporation. Section 1.61–4(d), Income Tax Regs., provides in part that:

the term "farm" embraces the farm in the ordinarily accepted sense, and includes stock, dairy, *poultry,* fruit, and truck farms; also plantations, ranches, and all land used for farming operations. All individuals, partnerships, or corporations that cultivate, operate, or manage farms for gain or profit, either as owners or tenants, are designated as farmers. * * * [Emphasis supplied.]

Certainly, Garth's was engaged in the poultry business and comes within the above definition of a farmer. Respondent does not dispute that Garth's operations do come within the definition of the term "farmer," but argues that because of its size and scope the conventional term "farmer" hardly fits for income tax purposes. Respondent made a similar argument with respect to an integrated broiler chicken operation in *United States* v. *Chemell,* 243 F. 2d 944 (C.A. 5, 1957). In that case respondent argued that the mechanical phases of the broiler chicken operations rendered it a commercial and industrial activity. In rejecting that argument, the Fifth Circuit stated:

The Government places emphasis upon the mechanical phases of the hatching of eggs but many phases of farming are now heavily mechanized. * * * The term "farm," by the definition of the regulations, includes poultry farms. The maintaining of a flock of hens producing eggs to be hatched into chicks and the growing of feed are agricultural pursuits and are parts of an integrated operation. * * *

Here, we cannot perceive how the size and scope of an operation, any more so than the mechanical phases of an operation, can change the nature of a poultry farming operation into an industrial activity.

With the fact in mind that Garth's was a farmer, we turn to the question of whether Garth's poultry flocks can properly be inventoried. Respondent argues that since the chickens were held primarily for the production of eggs, they were not held primarily for sale and are consequently not inventory-type property. In this regard, respondent maintains that the chickens should be characterized as "egg-making machines" and therefore production equipment used in Garth's trade or business. Petitioners on the other hand maintain that even though the chickens were held primarily for egg production, they were also held for sale because of their short productive life and that in fact the income received each year from the sale of chickens was substantial.

Section 1.471–1, Income Tax Regs., provides the general rule for inventories as follows:

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *

Regulations section 1.471–6, however, deals specifically with inventories of livestock raisers and farmers. It states, in pertinent part, as follows:

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner * * *

* * * * * * *

(c) Because of the difficulty of ascertaining actual cost of livestock and other farm products, farmers who render their returns upon an inventory method may value their inventories according to the "farm-price method," and farmers raising livestock may value their inventories of animals according to either the "farm-price method" or the "unit-livestock-price method."

(d) The "farm-price method" provides for the valuation of inventories at market price less direct cost of disposition. If this method of valuing inventories is used, it must be applied to the entire inventory except as to livestock inventoried, at the taxpayer's election, under the "unit-livestock-price method." * * *

* * * * * * *

(f) A taxpayer who elects to use the "unit-livestock-price method" must apply it to all livestock raised, whether for sale or for draft, breeding, or dairy purposes. * * *

(g) A livestock raiser who uses the "unit-livestock-price method" must include in his inventory at cost any livestock purchased, except that animals purchased for draft, breeding, or dairy purposes can, at the election of the livestock raiser, be included in inventory or be treated as capital assets subject to depreciation after maturity. * * *

While respondent's contention that poultry flocks held for the production of eggs constitute property used in the trade or business is tenable, the above-cited regulations make it clear that a farmer

is entitled to inventory livestock, including draft, breeding, or dairy livestock which is clearly property used in the trade or business. See sec. 1231(b)(3). "Indeed, since 1922, the Treasury Regulations have specifically contemplated that all livestock, whether raised for breeding or other purposes, were to be included in the inventory of accrual-method ranchers." *United States* v. *Catto*, 384 U.S. 102 (1966). Moreover, it is expressly required in section 1.61-4(b), Income Tax Regs., that an accrual-method farmer "must use inventories to determine his gross income."

Notwithstanding that poultry is specifically excluded from the term "livestock" under section 1231(b)(3), for purposes of section 1231, we think poultry is without question "livestock" as that term is used in the regulations under section 471. The reason for the exclusion of poultry from the definition of livestock in section 1231 appears to stem solely from the fact that Congress did not want to provide capital gain treatment for the sale of poultry flocks in view of their transitory nature. See 97 Cong. Rec. 12336 (1951).

Furthermore, the evidence adduced at trial reflects that Garth's not only held its poultry flocks for the production of eggs but also for sale. The fact that Garth's held them primarily for egg production does not preclude us from finding that Garth's also held them for another purpose; nor does it persuade us to conclude otherwise. Because of the short productive life of a laying hen (approximately 12 months), Garth's sold and replaced poultry flocks each year. Thus, it is only natural that Garth's held the chickens for egg production and sale, both of which went to produce income. Our conclusion in this regard is supported by Rev. Rul. 60-191, 1960-1 C.B. 78, which states, in pertinent part, that:

Poultrymen engaged primarily in selling eggs commercially commonly keep their laying hens only one year from the time they start producing. These hens are thus held for sale as well as for the production of eggs. In both instances, the farmers deduct the cost of feed and other costs in the year expended.

We, therefore, conclude that poultry flocks are inventoriable property.

The inventory valuation method used by Garth's was to value the chickens at the price for which they could be sold to meat-processing plants. Petitioners argue that this method was in accordance with the farm-price method permitted to be used by farmers under regulations section 1.471-6(c). Under the farm-price method property is valued at "market price less direct cost of disposition." Sec. 1.471-6(d), Income Tax Regs. Respondent argues, however, that in order to use the farm-price method, the farmer must be able to determine the proper "market price," in this instance that being the price at which Garth's could sell the chickens, not as meat, but as laying hens. He maintains that since there is no market for laying hens because of their unstable

nature once they begin to lay eggs, Garth's was not permitted under the regulations to employ the farm-price method. Not only do we disagree with respondent that Garth's was not entitled to employ the farm-price method, but we also conclude that Garth's method of valuing its poultry flocks was in accordance with the farm-price method.

Garth's valued its poultry flocks at the price for which they could be sold to meat-processing plants. This was the only market in which Garth's sold its chickens and, in fact, was the only market for its chickens once they became laying hens. While there was a limited market for pullets, Garth's was not in the business of selling pullets and, as the evidence clearly shows, Garth's did not during its existence ever sell any of its pullets. Thus, as we view it, Garth's used the proper market price in valuing its chickens for inventory purposes. We find completely untenable respondent's argument that since there was not a market for laying hens as such, the farm-price method could not be used by Garth's. None of the cases cited by respondent in support of his argument warrant such a conclusion.

Finally, respondent appears to argue that use of the farm-price method by Garth's had the effect of distorting income since it did not properly match costs against income. Because of this mismatching of costs against income, respondent contends that Garth's income was not clearly reflected. Although it is readily apparent that by using the farm-price method the costs incurred in raising a chicken until it reaches productive age might be deducted in a year other than that in which the chicken produces income, we are unable to conclude that because of this fact Garth's use of the farm-price method did not clearly reflect its income.

Petitioners put on several expert witnesses who all testified that Garth's method of inventory valuation was not only in accordance with generally accepted accounting principles but was also in accord with the best accounting practice in use at that time in the poultry farming business. These witnesses further testified unequivocally that Garth's method of accounting did clearly reflect its income. We agree.

Section 1.471–2 provides with respect to the valuation of inventories that:

(a) Section 471 provides two tests to which each inventory must conform:
(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and
(2) It must clearly reflect the income.
(b) It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with § 1.471–1 through 1.471–9. * * *

The evidence clearly demonstrates that Garth's used its method of inventory valuation consistently. Furthermore, as we have already

found, its method of inventory valuation was substantially in accord with the farm-price method authorized by section 1.471–6 of the regulations. The fact that Garth's method of valuing its poultry flocks did not provide for a precise matching of costs against income does not mean that Garth's income was not clearly reflected. The focal point of the regulations covering the valuation of inventories is consistency. We therefore conclude that Garth's use of the farm-price method on a consistent basis from year to year outweighs the fact that it did not provide for a precise matching of costs against income. Indeed, the revenue agent who examined Garth's records testified that the farm-price method employed consistently from year to year would clearly reflect income. Since Garth's method of accounting did clearly reflect its income, respondent is not empowered to reconstruct Garth's income on another method simply for the reason that respondent's method might match costs against income more precisely.[6]

As we understand respondent's argument on brief he does not urgently contend that if the laying hens are inventoriable petitioner's method of valuing the hens in the inventory does not correctly reflect income if used consistently. Rather, he contends that the laying hens are property used in petitioner's trade or business and not held primarily for sale to customers in the ordinary course of petitioner's trade or business and therefore must be capitalized, and amortized over the useful life thereof, and thus are not inventoriable property. Consequently, respondent does not really argue for any alternative method of valuing petitioner's laying hens for inventory purposes.

For reasons stated above we have concluded that petitioner's laying hens were inventoriable property and that petitioners were entitled to include the value thereof, determined under the farm-price method, in computing their cost of goods sold. This should decide the issue in petitioner's favor. We must observe, however, that even if the laying hens were considered to be equipment used in petitioner's business so that the cost thereof would normally be capitalized and either depreciated or amortized over its useful life, capitalization would not be required in this instance because the laying hens did not have a "useful life substantially beyond the taxable year." See regs. 1.263(a)–2(a). While the evidence on the point is not too clear, it does appear that the normal useful life of a flock of laying hens is 1 year plus or minus a few months. We do not consider this to be "substantially" in excess of 1 year. Consequently, petitioners would be entitled to deduct the cost of the "egg-making machines" currently. This is recognized by respondent's Rev. Rul. 60–191, 1960–1 C.B. 78, which was issued just

---

[4] If consistency has virtue in income tax accounting, as it obviously does, we find little virtue in respondent's attempt to change petitioner's method of accounting for the last 7 months of its existence from the method of accounting it had used consistently in prior years without change by respondent.

624

prior to the period here involved, the pertinent part of which is quoted above. In addition, we note that the amortization period used by respondent is only 11 months.

The second issue before us concerns the imposition of an addition to tax under section 6651(a) for Garth's late filing of its return. Section 6651(a) provides for an addition to tax of up to 25 percent of "the amount required to be shown as tax on such return." However, since we have concluded above that respondent's determination of a deficiency on Garth's income was incorrect and Garth's sustained a loss from its operations for its taxable period ending May 31, 1962, section 6651(a) is inapplicable. *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affirmed on another issue 315 F.2d 110 (C.A. 6, 1963).

Lastly, our conclusions above make it unnecessary for us to determine whether petitioners are transferees of Garth's since there is no unpaid tax liability of Garth's for its taxable period ended May 31, 1962.

*Decisions will be entered for the petitioners.*