HALLMARK CARDS, INCORPORATED AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4237-86.      Filed January 4, 1988.

*Jerome B. Libin* and *Bradley M. Seltzer,* for the petitioner.

*Kendall C. Jones,* for the respondent.

KÖRNER, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1975 | $7,547,995 |
| 1976 | 422,704 |
| 1977 | 2,454,969 |
| 1978 | 1,521,251 |

After concessions, the sole issue for determination is whether income from the sale of Valentine merchandise is properly reported by petitioner, a calendar year taxpayer, in the year in which title and risk of loss pass to the purchaser, or, as respondent maintains, whether the income from such sales is accruable as of December 31 of the year in which the merchandise is shipped.

## FINDINGS OF FACT

The facts of this case have been fully stipulated pursuant to Rule 122[1] and, to the extent relevant and material to

---

[1] All statutory references are to the Internal Revenue Code of 1986 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

resolution of the issue to be decided, are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is a privately held Missouri corporation whose principal place of business was at Kansas City, Missouri, at the time the petition herein was filed.

Petitioner's primary business is the manufacture and sale of greeting cards, giftwrap, ribbon, stationery, and related products. Within the industry, these products are collectively known as "social expression" merchandise. Petitioner maintains a leading position within this industry. Petitioner's customers are primarily card shops, department stores, drugstores, supermarkets, and other retail outlets. During the taxable years at issue, petitioner sold social expression merchandise to over 20,000 retailers at over 35,000 locations.

Petitioner sells social expression merchandise under two trademarks—Hallmark and Ambassador. The Hallmark label is reserved for merchandise to be sold at card shops, department stores, and similar "upscale" retail outlets. The Ambassador trademark is used on merchandise to be sold in supermarkets, discount stores, and similar mass-merchandising outlets. During the taxable years at issue, Hallmark sales accounted for approximately 85 percent of petitioner's total social expression sales volume, with Ambassador merchandise accounting for the remaining 15 percent.

Petitioner's social expression merchandise can be divided into two broad categories—everyday and seasonal. Everyday products are those which are normally purchased to commemorate birthdays, anniversaries, weddings, and similar occasions which occur throughout the year. Seasonal products are those designed to be sold during specific holiday seasons such as Halloween, Christmas, Easter, and St. Valentine's Day. During the taxable years at issue, everyday products accounted for approximately 60 percent of petitioner's total social expression sales volume. Seasonal products accounted for 40 percent of volume, with Christmas and Valentine sales the largest components within this segment.

When petitioner was a much smaller operation, it was able to ship merchandise directly from the production line

to its customers at the time the demand for the merchandise arose. For instance, Valentine merchandise could be shipped directly from petitioner's production line in early January to be on display in time for the Valentine season in early February. Petitioner would consummate the sale, pass title, and report income from the sale all at the time of shipment.

However, as petitioner's volume of business increased, problems with this system began to develop, particularly as regards Christmas and Valentine merchandise. Petitioner was forced to resort to overtime schedules and expand production facilities in order to meet the seasonal demand for these products. Once these busy seasons had passed, petitioner had to lay off workers and bear the cost of idle plant capacity during relatively quiet parts of the year. Also, as the volume of business grew, logistical problems developed in transporting merchandise to customers in time to meet the seasonal demand.

Petitioner sought to alleviate these problems by instituting a level production schedule throughout the year and establishing a regional warehousing system. Merchandise for the Christmas and Valentine seasons was produced throughout the year and shipped to the regional warehouses. As the holiday seasons approached, the merchandise was reshipped to customers as their orders were placed. Title to the merchandise passed and its sale was recorded at the time of shipment from the warehouse.

Although this warehouse system had its benefits, it soon became apparent that it had its weaknesses as well. The merchandise itself was ill-suited to warehousing, since each customer's order was usually made up of many small packages. The costs of handling each piece of merchandise twice, renting warehouse facilities, and transportation made the warehouse system an expensive solution to petitioner's problems. In addition, proper coordination of the system proved elusive, and missing and late shipments were a recurring problem. Also, questions were raised as to whether petitioner was doing business in the States in

which the warehouses were located, thus exposing petitioner to potential State income and franchise tax liability.

As an alternative to the regional warehouse system, petitioner embarked on a policy of shipping seasonal merchandise to customers in advance of the period during which the merchandise would normally be displayed and sold. As to Christmas merchandise, customers were generally willing to accept this merchandise in advance. The summer and early fall are traditionally slow retail periods and acceptance of Christmas merchandise during this period posed no undue hardships. However, petitioner's customers were less disposed to receiving Valentine shipments in advance. St. Valentine's Day falls shortly after Christmas, the busiest retail season of the year. Merchants were unwilling to accept large shipments of Valentine merchandise while their stores were filled with Christmas merchandise. Additionally, many calendar year customers were concerned over the financial impact of inclusion of large amounts of Valentine merchandise in their yearend inventories. There also was an unwillingness to bear the cost of personal property tax on Valentine merchandise included in yearend inventory. Thus, even though the regional warehouse system was eliminated in favor of advance shipment of most seasonal merchandise, customer intransigence forced that it be maintained for Valentine merchandise.

In 1958, petitioner concluded that it could eliminate the regional warehousing of Valentine merchandise and satisfy customer concerns over its early shipment (other than physical storage) by changing its terms of sale as regards Valentine merchandise. Shipments of Valentine merchandise would be made during the later part of the year preceding Valentine's Day; however, the terms of sale were that title to the goods and risk of loss would not pass to the buyer until January 1 of the following year. Although customers were in physical possession of the merchandise at yearend, they did not own it and therefore were not required to include it in yearend inventory or pay personal property taxes on it. The terms of sale of all other merchandise remained the same (i.e., title and risk of loss passed at time of shipment). Petitioner revised its order forms, sales invoices, and shipping documents to reflect this change in

sales terms for Valentine merchandise, and made substantial efforts to apprise its customers of the new policy. Customer reaction to the revised sales terms was generally favorable. Within petitioner, the practice of deferring title passage with respect to Valentine merchandise is referred to as the "Deferred Valentine Program." The Deferred Valentine Program has been followed by petitioner consistently from its adoption in 1958 through filing of the petition herein.

For certain years prior to the ones now before us, respondent, on audit, challenged petitioner's method of reporting income from Valentine sales under the new procedure. Such challenges were resolved administratively between the parties without the execution of any offer in compromise or closing agreement.

Respondent mailed notices of deficiency for the tax years 1975, 1976, 1977, and 1978 to petitioner on November 22, 1985. In those notices, respondent determined deficiencies in tax attributable to petitioner's allegedly improper deferral of income from Valentine sales until the calendar year following the year of shipment. The notices determined that this practice was inconsistent with petitioner's method of accounting for sales of other merchandise and resulted in a distortion of income.

Petitioner filed a petition with this Court seeking redetermination of the deficiencies on February 14, 1986.

OPINION

The determinations of respondent in his statutory notices of deficiency are presumptively correct and petitioner bears the burden of disproving the deficiency determined. *Welch v. Helvering,* 290 U.S. 111, 115 (1933); Rule 142(a).

One of the most fundamental concepts of our system of taxation is that tax is imposed "on the basis of annual returns showing the net result of all of the taxpayer's transactions during a fixed accounting period." *Burnet v. Sanford & Brooks Co.,* 282 U.S. 359, 365 (1931). See also *United States v. Consolidated Edison Co.,* 366 U.S. 380, 384-385 (1961). Taxable income for a particular accounting period is determined using the method of accounting used

by the taxpayer in regularly maintaining his books.[2] Sec. 446(a); sec. 1.446-1(a)(1), Income Tax Regs. The Code does not mandate that a taxpayer utilize any particular method of accounting, and specifically authorizes the use of: (1) The cash receipts and disbursements method, (2) an accrual method, (3) any other method authorized in the Code, or (4) any combination of the above as permitted by regulations. Sec. 446(c); secs. 1.446-1(a)(2), 1.446-1(c), Income Tax Regs. Although a taxpayer enjoys a great deal of flexibility in initially adopting an accounting method, once a method has been selected, it cannot be changed without first securing respondent's consent to the change. Sec. 446(e); sec. 1.446-1(e)(2), Income Tax Regs.

Respondent may disregard the taxpayer's use of his accounting method to determine taxable income when he determines that the taxpayer's method does not result in a clear reflection of income. Sec. 446(b). Respondent possesses "broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen,* 360 U.S. 446, 467 (1959). See also *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532 (1979); *Lucas & American Code Co. v. Commissioner,* 280 U.S. 445, 449 (1930), revg. 30 F.2d 222 (2d Cir. 1929). Ordinarily, a method of accounting which reflects a consistent application of generally accepted accounting principles will be regarded as clearly reflective of income. Sec. 1.446-1(a)(2), Income Tax Regs.; but see *Thor Power Tool Co. v. Commissioner, supra* at 539-540. Respondent's broad authority to determine whether a taxpayer's accounting method clearly reflects income is limited, in that he may not reject, as not providing a clear reflection of income, a method of accounting employed by the taxpayer which is specifically authorized in the Code or regulations and has been applied on a consistent basis. *Orange & Rockland Utilities v. Commissioner,* 86 T.C. 199, 215 (1986).

We now examine the facts of this particular case in light of this statutory background. Petitioner utilizes the calendar year as its accounting period and has employed an accrual method of accounting for both tax and financial

---

[2]"Method of accounting" denotes not only the taxpayer's overall method of accounting, but also the accounting treatment of any item. Sec. 1.446-1(a)(1), Income Tax Regs.

accounting purposes.[3] When an accrual method of accounting is utilized, an item of income is included in the taxpayer's gross income for the accounting period during which all the events have occurred which fix the taxpayer's right to receive the item of income, and the amount thereof can be determined with reasonable accuracy. Sec. 1.451-1(a), sec. 1.446-1(c)(1)(ii), Income Tax Regs.; *Spring City Foundry Co. v. Commissioner,* 292 U.S. 182, 184-185 (1934). Petitioner contends that, as regards Valentine merchandise shipped prior to yearend, this "all events" test is not satisfied until January 1 of the following year when title to the merchandise and risk of loss pass to the customer. Respondent argues that the all events test is satisfied, at the very latest, at midnight on December 31 of the year in which the merchandise was shipped. We agree with petitioner.

At what point in time a sale takes place is to be determined from the totality of the circumstances. While no single factor is controlling, passage of title is perhaps the most significant factor to be considered, although the transfer of possession is also significant. *Commissioner v. Segall,* 114 F.2d 706, 709-710 (6th Cir. 1940), cert. denied 313 U.S. 562 (1941). The objective is to determine at what point in time the seller acquired an unconditional right to receive payment under the contract. *Lucas v. North Texas Lumber,* 281 U.S. 11, 13 (1930).

Based on the record before us, it is indisputable that petitioner's rights under the sales contracts for Valentine merchandise do not mature until January 1 of the new year. Not until this point in time did petitioner relinquish the benefits and burdens of ownership of the merchandise in exchange for a right to receive payment. Since petitioner had no right to income prior to January 1, the first prong of the all-events test is not met until that date.[4] We cannot agree with respondent's characterization of the passage of title and risk of loss on January 1 as a mere "ministerial

---

[3] Since the manufacture and sale of merchandise is an income-producing factor, petitioner is required to maintain inventories. Sec. 1.446-1(a)(4)(1), Income Tax Regs. When inventories are maintained, an accrual method of accounting is required for purchases and sales. Sec. 1.446-1(c)(2)(i), Income Tax Regs.

[4] Since no right to receive income exists in the year of shipment, the second prong of the all-events test—whether the value of that right can be reasonably estimated—is never reached.

act" or "formality." Far from being a ministerial act, the passage of title and risk of loss to the buyer constitutes the very heart of the transaction and is the sine qua non to petitioner's right to receive payment. Until that moment in time when title passes, the potential buyer has mere possession of the merchandise and nothing more. Should it be destroyed while in his possession, the loss is suffered by petitioner. Should he decide that he does not wish to proceed with the transaction, he may return the merchandise to petitioner without penalty.[5] The fact that customers rarely exercised this right is of no consequence; it is existence of the right which controls.

Respondent's heavy reliance on *United States v. Hughes Properties, Inc.,* 476 U.S. 593 (1986), is in our view misplaced. That case concerned the deductibility by the taxpayer, a casino operator, of properly accrued progressive slot machine jackpots which remained unpaid at yearend. The Court allowed the deductions, holding that at the end of its taxable year, the taxpayer's liability for the accrued amounts was definite and fixed pursuant to Nevada law. The Court held that the remote possibility that the casino would cease operations—or the even more remote possibility that people would cease to gamble—went to whether the liability would eventually be paid—not to whether it had been incurred.

Respondent argues that since the Court in *Hughes* ignored these highly remote contingencies in allowing expense accruals, we should accrue Valentine income as of midnight, December 31, of the year of shipment, since at that point of time, there is no doubt that the sale will occur in the next instant.

Respondent misinterprets *Hughes.* In that case, all the events necessary to make the taxpayer's liability for the accrued amounts fixed and definite had occurred by the end

---

[5]Ambassador-brand Valentine merchandise is sold pursuant to a "sale or return" policy under which the customer has the right to return any merchandise which he fails to sell. Even though such merchandise is subject to return, income therefrom is properly accruable at the point of sale. *J.J. Little & Ives Co. v. Commissioner,* T.C. Memo. 1966-68. We disagree with respondent's contention that, as regards Ambassador-brand Valentine merchandise, the new sales contract terms adopted in 1958 did not alter rights the parties already possessed under the sale or return policy. Under the old sales terms, Ambassador merchandise, which remained unsold after having been offered for sale, could be returned to petitioner. Under the new sales terms, until passage of title and risk of loss on Jan. 1, the sale may be canceled and the merchandise returned without its having been offered for sale.

of its tax year. The remote contingencies in *Hughes* were found to go to whether the liability would be paid; as to the liability itself, there were no contingencies. Here, in contrast, petitioner does not possess any fixed and definite rights to payment at yearend. The fact that at the stroke of midnight petitioner knows with absolute certainty, that in the next instant, these rights will arise, cannot compensate for the fact that as of the close of the old year, they do not exist. The all-events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability—or even absolute certainty—that such right or obligation will arise at some point in the future. *United States v. General Dynamics Corp.*, 481 U.S. ____ (1987); *Brown v. Helvering*, 291 U.S. 193, 200-201 (1934). We thus hold that as to merchandise sold by petitioner pursuant to its deferred Valentine program, the all-events test is not satisfied until January 1, and that income from those sales is not accruable by petitioner until that date.[6] *Decision, Inc. v. Commissioner*, 47 T.C. 58, 62-64 (1966); *Cox v. Commissioner*, 43 T.C. 448, 456-457 (1965).

Respondent's argument that petitioner employs a "hybrid" method of accounting which does not clearly reflect income must also fail, since the linchpin of such an argument is that Valentine sales income is properly accruable on December 31. See *Public Service Co. of New Hampshire v. Commissioner*, 78 T.C. 445, 453 (1982). Since we hold that Valentine sales income is *not* properly accruable on December 31, petitioner's method of accounting is an accrual method and, as such, a "permissible method" pursuant to section 446(c)(2). As a permissible method of accounting which has been applied consistently, petitioner's method of accounting is deemed to clearly reflect income. *Orange & Rockland Utilities v. Commissioner*, 86 T.C. at 215. Respondent is without power to require a taxpayer to change from a method of accounting which clearly reflects income to any other method which respondent finds prefera-

---

[6]The business reasons for petitioner's adoption of the Jan. 1 passage of title and risk of loss are sound and have not been disputed. Thus, this is not a case where a taxpayer has deliberately manipulated the terms of sale so as to prevent income from accruing that it would otherwise become entitled to prior to the end of its taxable year. We express no opinion as to the tax consequences of such a situation.

ble. *Auburn Packing Co. v. Commissioner,* 60 T.C. 794, 798-800 (1973); *Garth v. Commissioner,* 56 T.C. 610, 623 (1971).

Respondent's theory that petitioner employs a hybrid accounting method is premised on a basic misunderstanding of section 1.446-1(c)(ii), Income Tax Regs. Respondent alleges that the "shipment method" is petitioner's predominant method of accounting which it uses for the sale of all merchandise with the exception of Valentine merchandise, income from the sale of which is accounted for using the "title method." However, the regulation reference to accounting for the sale of an item when shipped, delivered, accepted, or when title to the merchandise passes, does not refer to different accounting methods, but is merely illustrative of the different points in time at which an accrual method taxpayer may accrue an item of income. The touchstone for determining when an item may be accrued is the all-events test. *United States v. Consolidated Edison Co., supra* at 385. For any given manufacturer, this test may be satisfied when merchandise is shipped, accepted, delivered, or at some other point in time, depending upon the particular circumstances. Petitioner's change in the point of time at which it recognizes income from Valentine sales was in recognition of a change in the contractual terms under which it sold Valentine merchandise. A change in treatment of an item of income resulting from a change in underlying facts does not constitute a change in method of accounting. Sec. 1.446-1(e)(2)(ii)(*b*), Income Tax Regs. To hold otherwise would effectively give respondent the right to dictate to petitioner the terms under which it may sell its merchandise, clearly "an odious propagation of the tentacles of the government anemone." *Decision, Inc. v. Commissioner,* 47 T.C. at 64. We therefore conclude that petitioner has consistently used an accrual method of accounting for all sales both before and after its 1958 adoption of revised terms of sale as to Valentine merchandise.[7] Since petitioner has consistently utilized a permissible method of accounting which is deemed to clearly reflect income, respondent

---

[7]Since we find that petitioner has consistently employed an accrual method of accounting for all sales, we need not address petitioner's alternative argument that respondent effectively consented to petitioner's adoption of a hybrid method in 1958.

abused his discretion in requiring petitioner to adopt a different method of accounting for Valentine sales.

To reflect the foregoing, as well as concessions by the parties,

*Decision will be entered under Rule 155.*