T.C. Memo. 2000-233


UNITED STATES TAX COURT


VANDRA BROS. CONSTRUCTION CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15483-96.                    Filed August 2, 2000.


<u>Michael J. Occhionero</u>, for petitioner.

<u>Joseph P. Grant</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, <u>Judge</u>:  Respondent determined a deficiency of
$405,017, and an accuracy-related penalty under section 6662(a)
in the amount of $81,003.40, for petitioner's 1992 taxable year.
Unless otherwise noted, all section references are to the
Internal Revenue Code in effect for the year in issue.

After a concession by respondent,[1] we must decide whether respondent abused his discretion in determining that petitioner's use of the cash method of accounting did not clearly reflect income. We hold that he did.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits. At the time of filing the petition, petitioner was an Ohio corporation with its principal place of business in Oakwood Village, Ohio.

Petitioner specialized in the construction of streets, sidewalks, curbs, and similar improvements for governmental entities. All of petitioner's customers were governmental and municipal agencies, including the State of Ohio and municipalities within the State. Petitioner's expertise was construction, in particular laying concrete, on public sites such as city streets and sidewalks that required the project to be completed with a minimal amount of disruption in traffic flow and in compliance with governmental regulations. Petitioner provided labor and equipment,[2] but petitioner did not maintain a supply of any of the materials that were used at a construction site,

---

[1] Respondent concedes that petitioner is not liable for the accuracy-related penalty.

[2] Occasionally petitioner rented equipment to third parties.

instead relying on suppliers to deliver needed materials to the construction site at the appropriate time. Petitioner only ordered the materials it needed for the job for the particular day. Petitioner had no plant or other facility to store materials and could not store materials at the construction site. (Petitioner left no material on site overnight except, occasionally, a negligible amount.) Concrete could not be stored on site for an additional reason: Within a few hours of delivery, it would harden and become useless and worthless. Thus, petitioner tried to estimate as closely as possible the amount of materials needed so there would not be anything left over. Petitioner bore the cost of any wasted materials if they were the result of an over order, or, in the case of concrete, of it not being laid in time. If the materials were defective or, in the case of concrete, delivered too late, the supplier was responsible and bore the cost.

Virtually all of petitioner's projects required laying some concrete. Petitioner also engaged in related work, such as preparing a site by removing existing concrete or stone. Petitioner also installed items such as reinforcing steel, piping for sewers and drainage, and guardrails. During the year in issue, 67 percent of petitioner's total materials cost was due to concrete, 16 percent was due to stone, 6 percent was due to reinforcing material, and the remainder was due to other

materials.  In general, petitioner subcontracted for certain parts of projects, such as electrical work, asphalt, or landscaping.

Bids

Petitioner's work was generally obtained through competitive bids.  Petitioner's bids comprised costs for labor, equipment, and materials.  In computing its bid, petitioner estimated the cost of labor and equipment and added a markup to the cost of labor.  Further, petitioner estimated the quantity of materials, which could include concrete, aggregate (stone and gravel), reinforcing steel, piping for sewer and drainage, guardrail, etc.  However, petitioner did not add a markup to the cost of materials but rather included the cost of the materials, as quoted by the supplier, as an item in the bid.  During the year in issue, 27 percent of petitioner's gross revenue came from the material cost of concrete.  Petitioner would always solicit materials costs from at least two suppliers, and sometimes three or four, and would choose the lowest quoted cost for use in the bid.  The cost of materials was subject to slight variations due, for example, to the distance between a supplier and the job site.  However, petitioner got a discount for early payment to suppliers, which was not passed along to customers.  Occasionally a customer itself would supply materials (e.g., concrete), but this did not happen during the year in issue.

Bids were calculated by estimating the cost of each individual job that was necessary to complete the entire project. The bid price of most of the individual jobs was calculated on a per-unit basis. For instance, in arriving at a total bid for the reconstruction of a street in the City of South Euclid, petitioner bid $28 per square yard to install 9-inch reinforced concrete pavement, and $5 per linear foot to install 6-inch drainage conduit, and separate amounts for numerous other items. The bid price for some individual jobs was calculated on a per-item basis (for instance, $23 per each 9-foot guardrail post) or on a lump-sum basis (for instance, $60,000 for clearing and grubbing a certain area indicated in the project plan). The bid calculation also included the estimated number of units or items that the project required. However, petitioner would bill the customer on the basis of the number of units or items actually used on the project, not the number shown in the bid. In some cases, petitioner was required by the customer to state separately the cost of materials (i.e., without labor), and when so required, petitioner did so on a per-unit or per-item basis. Even if two jobs used the same amount of material, the amount of the bid could have differed substantially, due to different cost of labor and equipment. For instance, to maintain traffic flow, petitioner might be limited in the amount of work it could complete in one day, thus increasing costs of labor. Petitioner

did not begin any work without a written contract for that particular project.  There were penalties if petitioner did not comply with the contract.

When petitioner subcontracted, the subcontractor was responsible for labor, equipment, and materials for its part of the project.  Petitioner took bids on the subcontractor work and did not mark up the subcontractor's bids, except to cover its own bond costs and insurance.  When petitioner subcontracted, if the subcontractor did not pay its suppliers, those suppliers could file liens against petitioner.  Thus, petitioner took care in selecting subcontractors, trying to ensure they could pay their suppliers.

The construction season in general lasted from April to November.  Generally petitioner bid in the spring and finished the projects by November or December.  Occasionally work carried over to the next year.

Governmental Regulations

Petitioner's business was strictly regulated by its customers.  Both the State of Ohio and local governments stationed an engineer at each construction site to inspect materials and oversee the project.  Petitioner was required to pour concrete within 1 hour after the concrete supply truck left the supply plant.  If this condition was not met, the onsite engineer had the right to reject the load of concrete.  Further,

the engineer inspected the concrete to make sure it was not defective and had the right to reject it if it was. If concrete was rejected, the party responsible assumed the loss. For instance, if the supplier delivered defective concrete or did not deliver the concrete to the site in time to lay it within 1 hour of leaving the supplier's plant, the supplier assumed the loss. However, if petitioner failed to pour properly delivered concrete in time, petitioner assumed the loss. The governmental entity worked with petitioner and the supplier but ultimately held petitioner responsible for any failure to meet contractual obligations. Petitioner signed for the concrete after the government's inspector found it to be acceptable. The government's engineer gave permission to pour the concrete. Thus, for instance, if permission was given and concrete was poured, and then the concrete was damaged by rain before it dried, the governmental entity assumed responsibility. For State projects, the governmental regulation was so strict that petitioner did not need to guarantee materials; if the State allowed use of the materials, the State assumed responsibility for defects. For city projects petitioner guaranteed some materials, but the city would be responsible in some cases, for instance if its engineer had advised petitioner to pour concrete that was later damaged because of rain. During the 1990's, 30 to 40 percent of petitioner's work was for the State of Ohio.

Accounting Method, Payments, and Billing

From its inception through the year in issue, petitioner kept its books and records and reported its income using the cash receipts and disbursements method of accounting. Prior to and including the year in issue, petitioner's annual gross receipts did not exceed $5 million. Starting in 1991, petitioner prepared financial reports using an accrual method of accounting, the completed contract method. These financial reports were required by petitioner's bonding company. (Petitioner was often required to be bonded for its work.)

Petitioner's suppliers billed petitioner, not petitioner's customers, and petitioner made payment to the suppliers. If petitioner had the money on hand, petitioner would pay when billed. If not, petitioner would wait until the money was available. For some projects, petitioner paid for all materials before receiving any payment from its customer. Petitioner made payments for its labor costs on a weekly basis. The schedule on which petitioner billed and received payment from its governmental entity customers was regulated by them; there was a set schedule of payments over which petitioner had little or no control. The State paid biweekly, whereas other governmental entities paid monthly. Petitioner normally received payments based on the amount of the project that was completed. On at least one occasion during the year in issue, petitioner paid for

all materials in 1992, but petitioner did not receive a check from the customer until February 1993.  However, the project was completed in October 1992, and the delay in payment was beyond petitioner's control.

Petitioner made no attempt to defer income to a later year, and there were no prepayments of expenses.  Business decisions were made on the basis of the cash method financial records, even though the completed contract records were available.

In the notice of deficiency, respondent determined that petitioner was required to use an accrual method of accounting. By amendment to answer and stipulation of the parties, the parties agree that if petitioner was not entitled to use the cash method of accounting, then petitioner will elect to use, and respondent will allow the use of, the completed contract method of accounting.[3]

---

[3] The parties further stipulate that under the completed contract method of accounting, petitioner's income for the taxable year 1992 would be $433,862, which would result in a current year adjustment of $385,755 (after consideration of $48,107 in income reported on the cash basis) and adjustment required to be taken into account in 1992 under sec. 481 of $1,005,077.  Thus, the total increase in petitioner's taxable income for 1992 would be $1,390,832.

OPINION

We must decide whether respondent's determination that petitioner's use of the cash method of accounting did not clearly reflect income was an abuse of respondent's discretion.  We hold that it was.

In order to require a taxpayer to change its method of accounting, the Commissioner must determine that the method used by the taxpayer does not clearly reflect income.  See sec. 446(b); Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988).  While the Commissioner's discretion is broad, see Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979), it is not absolute, see Hallmark Cards, Inc. v. Commissioner, supra, and we find an abuse of discretion when the Commissioner's determination is without sound basis in fact or law.  See Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995).

In RACMP Enters., Inc. v. Commissioner, 114 T.C. 211 (2000), we addressed these issues in a factual context indistinguishable from the instant case.  In that case, we provided as follows:

> Whether * * * [the taxpayer] is required to report its income on the accrual method of accounting instead of the cash method depends on whether * * * [the taxpayer] is in the business of selling merchandise to customers in addition to providing service or whether the material provided by * * * [the taxpayer] is a supply that is incidental to the provision of the contracted service.  [Id. at 220; citations omitted.]

In that case we found that the taxpayer, a company engaged in the laying of concrete and the installation of related items, such as sand, rock, wire mesh, and rebar, did not sell merchandise to its customers. Rather, relying on Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999), we found that the concrete and related materials were supplies consumed by the taxpayer. In Osteopathic Med. Oncology & Hematology, P.C., we held that chemotherapy drugs furnished by a healthcare provider in treating cancer patients were supplies rather than merchandise because the taxpayer was a service provider and the drugs were an "integral and inseparable part of its service." Id. at 384. Similarly, in RACMP Enters., Inc. v. Commissioner, supra, we held that the taxpayer was a service provider, and we found that the materials used in construction were not merchandise because they were "indispensable and inseparable from the service provided by" the taxpayer. Id. at 228. In conclusion, we held that because the taxpayer did not produce or sell merchandise, the taxpayer could not be required to use inventory accounting. See id. at 229.

In the instant case, the concrete, stone, reinforcing steel, and other items (collectively, the materials) used by petitioner were not merchandise for the same reasons stated in RACMP Enters., Inc.: First, the materials lost their separate identity when used in a construction project. Second, petitioner did not

contract to sell the materials but rather contracted to provide finished walkways, repaired streets, and the like. Third, the construction projects that petitioner engaged in were improvements to real property. Fourth, petitioner did not leave any of the materials on the construction site, or store them for use for a later project. See id. at 228-231. Given our recent holding in RACMP Enters., Inc., and the indistinguishable facts of the instant case, we hold that petitioner was not engaged in the production or sale of merchandise. Therefore, petitioner cannot be required to use inventories, and the Commissioner abused his discretion in requiring petitioner to change from the cash method of accounting.

To reflect the foregoing,

Decision will be entered

for petitioner.