MAPLE LEAF FARMS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8314-73. Filed June 19, 1975.

*Robert N. Davies* and *Richard E. Aikman,* for the petitioner.
*Thomas J. Meyer,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

---

| TYE Nov. 30— | Amount |
|---|---|
| 1967 | $240,921.60 |
| 1968 | 82,394.01 |
| 1969 | 154,122.63 |

Other issues having been settled, the only issue for our determination is whether petitioner is a farmer, as opposed to a processor, and is therefore entitled to report its income by the cash receipts and disbursements method instead of the accrual method of accounting in accordance with section 1.471-6(a), Income Tax Regs.[1]

### FINDINGS OF FACT

Certain facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is an Indiana corporation with its principal office in Milford, Ind., at the time it filed its petition herein. For the taxable years in issue, petitioner filed its Federal corporate income tax returns with the Internal Revenue Service Center, Covington, Ky.

Petitioner reported its income for the taxable years in issue by the cash receipts and disbursements method of accounting. It also maintained records of inventories, accounts receivable, and accounts payable during the taxable years in issue and had its accountants prepare yearly profit-and-loss statements and balance sheets by the accrual method of accounting.

From 1967 to 1969, petitioner raised an average of approximately 10,000 ducks per month on its property. On this same property, it also slaughtered and processed an average of 100,000 ducks per month. The excess of ducks slaughtered and processed over ducks grown was raised by growers working, during the years in issue, exclusively for and under oral contracts with petitioner. The number of growers under contract with petitioner varied between 16 and 22 and their farms were all within a 25-mile radius of petitioner's. In 1970, petitioner prepared a standard written agreement which contained substantially the same terms and conditions as the prior oral contracts.

---

[1] All Code section references herein shall refer to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and all references to the Income Tax Regulations shall refer to those regulations promulgated pursuant thereto.

Pertinent parts of this Duck Growing Agreement (hereinafter agreement) provided:

This agreement is made and entered into this — day of —, 19— by and between — herein after called the "Grower" and Maple Leaf Farms, Inc., herein after called the "Owner". This agreement shall be for — years from date hereōf.

In consideration of mutual promises herein contained, the respective parties hereby agree as follows:

The Owner Agrees:

1. To supply at a charge to the Grower [a specified number] (more or less) day old ducklings for the houses on the Growers premises, located at [grower's address].

Acts of God, wind, fire, plant loss, the inability of the hatchery to deliver the agreed number, or any losses beyond the immediate control of the Owner may alter the above agreed number.

2. To supply at a charge to the grower for growing these ducklings all feed, medication and vaccines.

3. To provide periodically a supplementary agreement, covering the cost of feeds, day old ducklings, medication, and the amount of money to be credited to the Grower for live birds.

4. To provide transportation for these ducklings to and from the Grower's premises.

5. To take possession from the Grower at approximately 7 weeks of age all U.S.D.A. inspected and approved ducklings.

6. The Owner will not accept any duck condemned for: 1. Tuberculosis, 2. Leukosis, 3. Septicaemia and Toxemia, 4. Synovitis, 5. Tumors, 6. Bruises, 7. Airsacculitis. The ducks condemned will be taken from the USDA Poultry Condemnation Certificate. These ducks will be deducted from the total live weight at the rate of six pounds per duck. All other condemns which are of plant origin will be taken as approved ducks.

7. To advance to the Grower 2¢ per pound for total pounds received at 7 weeks of age, for Summer production and 3¢ per pound for Winter production, the balance to be paid at the end of the fiscal year, after the Grower's account has been closed for the year. If an indebtedness is incurred by the Grower, said debt will be carried to their next project year.

8. To pay all property taxes and insurance covering these ducklings, feed and medican [sic], for fire, lightning, smoke, wind, hail, explosion, earthquake, rioting, flood, fallen aircraft or objects there from, collision or over turn while trucking to plant.

The Grower Agrees:

1. To furnish suitable buildings and/or pools, equipment, and facilities for growing these ducklings.

2. To furnish all labor required to care for these ducklings.

3. To provide, in case of his inability to properly care for the ducklings, competent help that will meet with the approval of the Owner.

4. To remove all ducks going to slaughter from feed in adequate time to assure completely empty crops and intestines before ducks are removed from Growers premises.

5. To provide adequate loading ramps and labor to load these ducklingsc [sic] onto the Owner's transportation.

6. To notify the Owner immediately if ducklings become unhealthy or appear to be suffering from a disease or ailment.

7. Not to sell or transfer any of the ducklings, feed, or other materials supplied by the Owner to any other person or Company without prior consent of the Owner.

8. To follow all recommendations of the service man and management program outlined below.

A. That premises, including feed room, brooding area, pools, lots, and ground surrounding the buildings and pools shall be thoroughly cleaned and disinfected prior to arrival of ducklings.

B. To provide at least one brooder stove for every 500 ducklings placed.

C. To use only approved types of litter, pine shavings preferred.

D. Ducklings shall not be crowded. Provide at least $\frac{3}{4}$ square feet of house area per bird from day old to two weeks of age, and $1\frac{1}{4}$ square feet of house area per bird from two weeks to four weeks of age. If birds are to be grown from four weeks to seven weeks inside a building, provide at least three square feet per bird.

E. To provide one pool for each 2000 ducks. Pool size should be approximately 100 ft. long, 10 ft. wide with a 50 ft. long drinker. Lot size should be no less than 40,000 square ft., per pool, with good drainage.

F. To provide supplementary waterers for the first two days after ducklings are placed.

G. To provide adequate water space during the growing period, at least 16 linear ft. per 500 birds till four weeks of age and 32 linear ft. per 500 birds after four weeks of age, properly placed.

H. That feed will be kept in a clean, dry place, free of free flying birds, and rodents.

I. That feed will not be fed on the floor or ground. Supply adequate feeder space. Feed must be fed in an approved type of feeder, that will eliminate feed waste and provide adequate feed storage.

J. That wild animal and rodent control must be carried out in and around buildings and lots.

K. That buildings will be bedded at least once a day with clean, dry bedding, more often if necessary to keep litter dry and birds comfortable.

L. That proper ventilation will be carried on in buildings as required; mechanical ventilation is preferred.

M. That at least 8 gal. of water per minute will be supplied to each pool 24 hours a day while pools are in use.

N. That pools will be drained and scrubbed each day while in use.

O. That all perimeter fences around lots will be at least 5 ft. in height, and of a mesh so constructed as to restrict wild animals.

P. That adequate lighting will be provided at each loading ramp.

Q. That loading ramps will be constructed, maintained, and positioned as recommended.

R. That weeds and brush will be kept cut around loading ramps and along the drives leading to and from these ramps or feed bins.

S. That weeds and brush be kept cut along the outside of all perimeter fences.

T. That roads or drives to loading ramps and feed containers will be constructed in such a manner so as to provide for the free access and movement of live duck trucks and feed trucks.

U. That adequate lot fences will be maintained to keep all age groups separate at all times.

It is mutually agreed that:

1. All ducks being slaughttered [sic] will be weighed on the Owner's scales by qualified personnel approved and provided by the Owner.

\* \* \*

3. This agreement shall be void if the Grower does not fulfull [sic] the management requirements in previous paragraphs.

4. This agreement shall be void if the quality of ducklings grown does not meet the standards set by the Owner, as follows:

A. Live weights must average above 6 lbs. per duck.

B. Grower condemnations not to exceed 1% of total live weight.

C. Grades must be above 85% A Grade as determined by USDA Grader.

5. The Owner shall retain title to all materials delivered to the Grower under this agreement.

6. Should either party desire to discontinue this agreement, he may do so at the completion of any brood, provided: he has given notice to the other party at least — days prior to the next placement date.

Petitioner purchased 1-day-old ducklings from Wayne Duck Farm & Hatchery, Inc., of Wayne, Ohio (hereinafter referred to as the Hatchery), and, under paragraph 1 (The Owner Agrees, p. 440, *supra*) of the agreement, supplied them "at a charge"[2] to the growers. Employees of petitioner scheduled the time of delivery of the ducklings—occasionally, from the Hatchery to petitioner's own property and then to the growers or, usually, directly to the growers. The contract between petitioner and the Hatchery provided for a price of 28¢ per duckling during 1968 and 29¢ per duckling during 1969[3] and that "Title to all ducklings sold pursuant to this agreement shall pass at the Buyer's dock." Petitioner paid the Hatchery directly for each duckling delivered to its growers.

Under paragraph 2 (The Owner Agrees, p. 440, *supra*) of the agreement, petitioner furnished, "at a charge" to each grower, all feed, medications, and vaccines needed in the growing process. Petitioner selected all feed and medications it determined to be necessary and paid the suppliers for these items. As his supply of

---

[2] As used herein, the word "charged" or "charge" refers to debits to a grower's account with petitioner as explained at pp. 443-444, *infra*.

[3] There is no evidence in the record of the price petitioner may have paid for ducklings in 1967.

feed ran low, each grower notified the feed mill and ordered the feed to be delivered directly to his premises. As medication was needed, each grower would notify petitioner, who would authorize delivery of such medication from the supplier to the grower.

Petitioner retained legal title to "all materials delivered to the Grower" pursuant to paragraph 5 (mutual agreements, p. 442, *supra*) of the agreement, which included the ducks, feed, medications, etc. Petitioner carried and paid for insurance and paid all Indiana personal property taxes on the ducks and feed in the possession of the growers.

Petitioner did not lease any land of any of the growers for the purpose of raising ducks. The growers provided, on their own premises, the services called for in the eight paragraphs of the agreement under "The Grower Agrees." Periodically, an employee of petitioner, known as a fieldman, would visit each grower and would check the facilities to be sure the requirements of the agreement were being met. On these trips, he would often give criticism and make recommendations.

When the ducks raised by the growers reached the age of 7 weeks, petitioner would arrange to pick them up and truck them to the slaughtering and processing plant on its own premises. Once there, the birds were killed, defeathered, eviscerated, packaged, and frozen. Any ducks condemned by the USDA were not accepted by petitioner.

Petitioner used growers to raise a majority of its ducks, instead of raising them on its own land, for three primary reasons: (1) The growers were generally former poultrymen who had unused land and buildings which petitioner could take advantage of more economically than buying its own land and constructing new facilities, (2) having the ducks dispersed was advantageous for disease-control purposes, and (3) petitioner found that it got better quality work from independent, profit-motivated growers than it could get from employees on its own farm. The growers often preferred raising ducks for petitioner rather than as independent businessmen because: (1) It provided an established market, considerably reducing the growers' risks and (2) they often lacked the necessary capital to purchase and carry the feed and ducks.

Petitioner did not consider the growers as its employees and did not include them in its profit-sharing or medical plans. Peti-

tioner withheld F.I.C.A. and income taxes from salaries to its employees but did not withhold either item from payments to its growers.

For each grower, a grower's project account was opened and thereafter maintained by petitioner. Debits to each account were made by petitioner at the time of delivery of ducklings, feed, and medication purchased by petitioner and delivered to the particular grower. At the end of the 7-week growing cycle, when the ducks were delivered back to petitioner's plant, a credit was made to the grower's account for each pound of live, uncondemned duck delivered. The credits to the growers were reduced by petitioner by charges for trucking from their premises to petitioner's processing plant in 1967 and 1968, but, with a minor exception, this was not the case in 1969. The amount of such debits for ducklings, feed, and medication and credits for pounds of live, uncondemned duck was set at the beginning of each growing year although the credits were occasionally varied.[4] During the 3 years in issue, petitioner made cash advances of 1.5¢ to 2.5¢ per pound for each pound of live, uncondemned duck delivered.[5] The credit for delivered ducks was then reduced by the amount of such cash advance.

The amount the growers were debited often differed from the amount petitioner had paid for that item. For example, in 1968 and 1969, each grower was debited 28½¢ for each duckling delivered, although petitioner's cost for ducklings in those years was 28¢ and 29¢, respectively. Also, each grower's account was debited $92 per ton for starter feed delivered in 1967, 1968, and 1969, although the feed cost petitioner only $71 per ton in those years. No debits were made to the grower's account for the insurance premiums or personal property taxes paid by petitioner (see p. 443, *supra*). In the event of a fire or other insured loss on the premises of a grower, the insurance company would pay petitioner for the loss in respect of its feed and ducks and petitioner would then credit the account of the grower for the amount previously debited for the ducks and feed destroyed.

---

[4] The credits seem to have been fixed at 24¢ per pound for ducks delivered during the "winter" months and 21¢ per pound during the remaining months, except that during the "summer" months of 1968 and 1969 and the "fall" months of 1969, petitioner voluntarily increased the 21¢ to 22¢ (see table at p. 445, *infra*) because it was having a profitable year but the growers were not doing as well as had been expected due to (1) increased disease level, (2) processing running behind schedule, and (3) inferior quality feed.

[5] Compare with agreement, par. 7 (The Owner Agrees, p. 440, *supra*).

Since, at the beginning of each year, each grower knew what amounts he would be charged and the amount he would be credited for each pound of delivered duck, he could figure approximately what he could earn during the year—changes in the poultry and grain prices would not affect him—and then decide whether he wanted to participate that year. Both petitioner and its growers made some prediction about the expected percentage of ducks that would die or be condemned in any given year. Growers used this prediction to project their probable income from growing. In the event of an abnormal or unusually large loss, the growers generally believed that petitioner would help them absorb some of it.[6]

During the years in issue, petitioner credited the growers with the following amounts per pound of live, uncondemned duck: [7]

|       | 1st quarter | 2d quarter    | 3d quarter   | 4th quarter   |
|-------|-------------|---------------|--------------|---------------|
| 1967  | [8]---      | 24¢ and 21¢   | 21¢          | 21¢ and 24¢   |
| 1968  | 24¢         | 21¢           | 21¢          | 21¢ and 24¢   |
| 1969  | 24¢         | 24¢ and 21¢   | 21¢ and 22¢  | 22¢           |

At the end of petitioner's fiscal year, each grower's project account was closed and adjustments were made for feed or ducklings charged to the grower but still on hand. After adjustments, each grower's balance was determined. If a grower had a credit balance at yearend, he would be paid that amount in cash. If a grower had a debit balance at yearend, and continued to grow for petitioner during the subsequent year, the balance would be carried forward as the opening balance in that subsequent year. (See par. 7 (The Owner Agrees, p. 440, *supra*) of the agreement.) If, however, the grower did not continue to grow for petitioner in the ensuing year, no attempt was made by petitioner to collect a debit balance. Neither petitioner nor the grower considered it to be an outstanding debt owing.[9]

The Foster Duck Farm, located in Wayne, Ohio, is both a grower and processor of ducks, which, like petitioner, processes many more ducks than it grows. (During the years in issue, it

---

[6] In a year prior to the years in issue, petitioner aided one grower who had an abnormally large number of condemned ducks by not making the full reduction for the condemnations.

[7] The figures are the beginning and ending figures for each quarter year. Where a single figure appears, price was constant throughout the period.

[8] No evidence was presented for this quarter.

[9] In one instance where a grower stopped growing for petitioner for the 2 years after incurring a debit balance, but then began again, the earlier debit balance was not carried forward to the new project account.

raised approximately 3,000 ducks every other week and processed approximately 5,000 to 6,000 per week.) Unlike petitioner, however, the Foster Duck Farm had no interest in the ducks delivered to it by independent growers prior to the actual delivery. The table below reflects the prices it paid per pound, during the years in issue, for 7-week-old ducks. No adjustments were made by the Foster Duck Farm for condemnations, barring a major case. Herb Culver grows ducks in Middlebury, Ind., and sells them to the C&D Duck Co. in Wisconsin. Culver breeds and maintains his ducks and furnishes all his own feed, medications, and transportation to the C&D processing plant. (Culver delivered approximately 150,000 ducks per year to C&D during the years in issue.) The table below also reflects the prices per pound paid Culver by C&D for 7-week-old ducks delivered to C&D. C&D adjusted its payments for condemned ducks.

| 1967 | 1st quarter | 2d quarter | 3d quarter | 4th quarter |
|---|---|---|---|---|
| Foster [10] | x | 22½¢ and 21¢ | 20½¢ and 21¢ | 21¢ and 23¢ |
| Culver [11] | 24.47¢ | 22.75¢ | 22.23¢ | 24.40¢ |
| 1968 | | | | |
| Foster | x | 23¢ and 21½¢ | 21½¢ and 21¢ | 21¢ and 23¢ |
| Culver | x | 24.35¢ | 24.17¢ | 24.87¢ |
| 1969 | | | | |
| Foster | x | 23¢ | 23¢ | 23¢ and 24¢ |
| Culver | 24.82¢ | 24.64¢ | 23.81¢ | 24.47¢ |

Petitioner sold its frozen packaged ducks to poultry distributors and national or regional retail chainstore buyers. During the years in issue, petitioner employed three salespersons who were active throughout the United States. The only substantial consumer market in the United States during the years in issue was for cleaned and frozen duck. There was no substantial consumer market for live ducks and only about 5 percent of the ducks purchased by consumers during the years in issue were cleaned and chilled.

ULTIMATE FINDING OF FACT

Petitioner was a farmer within the meaning of section 1.471-6(a), Income Tax Regs., and is entitled to use the cash receipts and disbursements method of accounting.

[10] Foster's figures are beginning and ending figures for the particular quarter. Where only a single figure appears, the price was constant for that quarter. "x" indicates that there were no sales reported for a particular quarter.

[11] Culver's figures are quarterly averages.

OPINION

Respondent has determined that the cash receipts and disbursements method, consistently used by petitioner for income tax purposes, did not clearly reflect income because it failed to take substantial inventories into account. Sec. 471; sec. 1.471-1, Income Tax Regs. To account for these inventories, respondent has recomputed petitioner's income by the accrual method. Ignoring the potential issue of whether the cash method clearly reflected income, petitioner justifies his use of it solely on the "historical concession by the Secretary and the Commissioner"[12] that farmers may use the cash method regardless of inventories or a potential distortion of income. Secs. 1.471-6(a)[13] and 1.61-4, Income Tax Regs.

There is no question but that the duck-growing process constitutes "farming" and that the place where it is conducted is a "farm." See secs. 175(c)(2), 180(b), 182(c), 6420(c)(2) and (3); secs. 1.61-4(d), 1.175-3, 1.180-1(b), 1.182-2, Income Tax Regs. Neither the degree of mechanization (*United States v. Chemell*, 243 F.2d 944, 948 (5th Cir. 1957), affg. *Dodd v. United States*, an unreported case (N.D. Ga. 1956, 51 AFTR 1405, 56-2 USTC par. 9673)) nor the size and scope of operation (*Auburn Packing Co.*, 60 T.C. 794, 802 (1973); *W. P. Garth*, 56 T.C. 610, 619 (1971)) has any bearing on this question. "The breadth of the definition cannot be denied." *Hi-Plains Enterprises, Inc.*, 60 T.C. 158, 162 (1973), affd. 496 F.2d 520 (10th Cir. 1974).

The question before us is whether the petitioner was a "farmer." Section 1.61-4(d), Income Tax Regs., provides in part:

(d) *Definition of "farm"*. As used in this section, the term "farm" embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms; also plantations, ranches, and all land used for farming * * *. All individuals, partnerships, or corporations that cultivate, operate, or manage farms for gain or profit, either as owners or tenants, are designated as farmers. * * *

---

[12] *United States v. Catto*, 384 U.S. 102, 116 (1966). See *W. Cleve Stokes*, 22 T.C. 415, 424 (1954). It is presumably for this reason that respondent has renounced any reliance on sec. 446 herein.

[13] Sec. 1.471-6. *Inventories of livestock raisers and other farmers.*

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in paragraph (e) of section 1.446-1.

Section 1.175-3, Income Tax Regs., provides in part:

A taxpayer is engaged in the business of farming if he cultivates, operates, or manages a farm for gain or profit, either as owner or tenant. For the purpose of section 175, a taxpayer who receives a rental (either in cash or in kind) which is based upon farm production is engaged in the business of farming. However, a taxpayer who receives a fixed rental (without reference to production) is engaged in the business of farming only if he participates to a material extent in the operation or management of the farm.* * *

Undoubtedly the growers involved herein were "farmers." *Hi-Plains Enterprises, Inc., supra.* If petitioner had carried on the growing process without the intervention of the growers it seems clear that it too would be considered a "farmer," irrespective of the fact that it did not conduct the growing activities on its own land. *Maple v. Commissioner,* 440 F.2d 1055, 1071 (9th Cir. 1971), affg. T.C. Memo. 1968-194; *United States v. Chemell,* 243 F.2d at 947; *Peterson Produce Co. v. United States,* 205 F. Supp. 229 (W.D. Ark. 1962), affd. 313 F.2d 609 (8th Cir. 1963); *W. P. Garth, supra.* This is one end of the spectrum. At the other end is the situation which would exist if petitioner had in no way been involved in the growing of the ducks but had simply purchased matured ducks from growers and processed them; in such circumstances, it would not be considered a "farmer." Cf. *N.L.R.B. v. Strain Poultry Farms, Inc.,* 405 F.2d 1025, 1028 (5th Cir. 1969). Our problem is to determine whether, during the taxable years in issue, petitioner was sufficiently near the "grower" end of the spectrum to justify the conclusion that it should be considered in the business of raising ducks, i.e., a "farmer." We conclude that it was.[14]

As we see it, petitioner satisfies the two essential elements reflected in the decided cases—i.e., it participated to a significant degree in the growing process and it bore a substantial risk of loss from that process.

In respect of the first element, petitioner selected and purchased the ducklings and determined all necessary feed and medication required by the growers, who served petitioner exclusively. It retained title to all ducks, feed, and medication while in the growers' possession. It exercised substantial

[14] We note that a certain part of petitioner's activities (it grows some crops on its land and raised 10 percent of the ducks it processed) are conceded by respondent to be farming activities. However the evidence submitted does not permit an allocation to this part; hence, we must treat this case as it has been framed, i.e., an "all or nothing" proposition.

supervision and control over the growing process. The entire second section of the agreement, especially paragraphs 8.A through U. (see pp. 441-442, *supra*), stands as testimony to this. The specificity of these provisions goes far beyond the usual "quality control provisions" found in franchising arrangements— an analogy which respondent would have us apply herein. If any requirement was not complied with, paragraph 3 (mutual agreements, p. 442, *supra*) of the agreement makes it clear that the agreement is void. Additionally, petitioner employed a fieldman who periodically visited each grower to make sure the requirements of the agreement were met and who gave the growers criticism and made recommendations as to their activities. We find this to be both "substantial and regular" within the meaning of *United States v. Chemell,* 243 F.2d at 947. In that case, the Court of Appeals said (p. 947): "to be considered to be farming or raising poultry, it is not necessary for a taxpayer to show that he did everything that was done in the raising of the poultry." Finally, section 1.175-3 of respondent's regulations recognizes that one need not participate on a day-to-day basis to be considered a farmer; a landowner receiving a fixed rental need only participate to "a material extent" and one receiving a rental based on production need not participate at all.

With respect to the second element, respondent argues that since petitioner credited the growers only for pounds of live, uncondemned duck, the growers took all the risks of mortality and condemnation. We see no reason to review in summary form all that we have laid out in detail in our findings concerning petitioner's accounting system. While we do not agree with petitioner that the debits and credits to the growers' accounts were "arbitrary," neither do we agree with respondent that they reflect nothing more than sales of ducklings, feed, and medication to the growers and independent purchases of the live 7-week-old ducks. Rather, we view the financial arrangements as reflecting a method whereby petitioner simply made compensatory accounting entries to reflect the net amount due to the growers for efficient services in respect of its ducks.

Percentage tables, based on prior experience, were used by petitioner and the growers to project an acceptable level of condemnations and mortality for the ensuing year. This was a major factor in setting in advance the measure of the debits and credits for each year upon the basis of which the petitioner and

the grower could each decide whether to participate for that year. In a very real sense, each party discounted in advance its risk of normal loss during that year. Of course, if a grower was consistently inefficient, he would incur a large debit balance but the arrangements between him and petitioner operated in such a fashion that a substantial out-of-pocket financial impact fell upon the petitioner.

The unforeseen loss of a flock is the major risk in poultry raising, not normal mortality. *Maple v. Commissioner, supra.* If fire were to strike a grower, petitioner would clearly have suffered the loss. The grower would lose nothing on the ducklings, feed, or medicine as the debits would be reversed by petitioner, who carried and paid for insurance against such a catastrophe. The risk of an unusual mortality or condemnation rate due to a communicable disease was not insurable and, in theory, the risk was on the grower through the elimination of condemned ducks. Such eventuality rarely occurred, but it appears that when it did, petitioner absorbed a portion of the loss.[15]

Respondent argues that the debit balance was, in actuality, a debt of the grower due petitioner which could have been collected pursuant to the agreement, which refers to "an indebtedness * * * incurred by the Grower." (Paragraph 7 (The Owner Agrees, p. 440, *supra*) of the agreement.) The uncontroverted evidence is, however, that a debit balance was *never* collected and the parties to the agreement considered it uncollectible. Thus, if the grower quit after a disease-filled year, petitioner alone suffered the loss. If the grower continued in the succeeding year, the debit balance would, however, be carried forward. In this event, the grower still would be entitled to be paid the cash advance and to be credited with the full per pound price for live, uncondemned ducks, but he would receive no payment until he had eliminated the debit balance. The net effect of this was simply to reduce the compensation and incentive rewards that the grower could obtain in the future; it did not require any out-of-pocket payment by the grower to petitioner.

Another risk assumed by petitioner involved market uncertainties. Petitioner could have been caught in the middle of rising or falling prices for the ducklings, feed, and medication it purchased and the ducks it sold, as its debits and credits to

---

[15] See n. 6 *supra.*

growers were unaffected by such changes. By way of contrast, the grower knew in advance what the measure of the debits and credits to his account would be. That spread was locked up and, indeed, the lack of risk thus effectuated was a primary reason for the grower to participate. Respondent points to paragraph 3 (The Owner Agrees, p. 440, *supra*) of the agreement and argues that petitioner could always adjust its prices or even terminate pursuant to paragraph 6 (mutual agreements, p. 442, *supra*). In point of fact, however, the supplemental agreements referred to in paragraph 3 were provided and revised annually. There is no evidence to the contrary, nor do we have any reason to believe, that petitioner viewed or utilized the termination clause as a means of shifting the market risks.

Obviously, the grower also bore some risks of loss from the growing process, e.g., nonpayment for condemned ducks and out-of-pocket costs for labor, etc. But, on balance, we believe that the petitioner assumed a risk of loss from the growing process of sufficient magnitude to satisfy this element of the "farmer" formula. One need not bear *all* the risks of loss to be considered a farmer.

The primary emphasis of respondent's argument herein is that petitioner had no profit interest in the growing, no interest at all, in fact, except as a source of supplying its processing plant, to which, he contends, petitioner looked for all its profit. To substantiate this argument, he compares petitioner's credits for live, uncondemned ducks to the amounts paid by Foster Duck Farm and C&D Duck Co. and concludes that since the prices were consistently comparable, petitioner could not possibly have had any greater profit interest in the growing than did Foster or C&D. But this result does not follow, since Foster and C&D, as best we can conclude from the record, were solely processors. They were not in any way involved in the growing process and the amounts they paid represented their total cost of ducks. Petitioner, on the other hand, was integrally involved in the growing process, expending time and money and assuming substantial risks. Its cost was far different and can only be calculated by considering its hatchery expenses, feed, and medicine costs, its payments to growers, and other expenses (such as its fieldman's salary). The mere happenstance that the prices credited by petitioner to the growers for the live ducks were substantially the same as the prices paid by the processors is a totally insufficient

counterweight.[16]

Moreover, we note that, under the circumstances herein, the growing process as such could not produce a profit, since, by hypothesis, the ducks were not sold immediately after the completion of the process. They were processed into frozen ducks and thus it can be said that it was the freezing process and the subsequent distribution that produced the profit. If respondent were correct in his contention, only participation in a "farming" part of an overall operation, the last step in which also constituted "farming," would permit the conclusion that the participant was a "farmer." This appears to have been the factual situation in the decided cases. See *Maple v. Commissioner, supra; United States v. Chemell, supra; Peterson Produce Co. v. United States, supra; Hi-Plains Enterprises, Inc., supra; W. P. Garth, supra.* But nothing in those cases indicates that the definition of a "farmer" should be so restricted and we find nothing in the instant situation to justify imposing such a restriction on this petitioner.

Recognizing that the resolution of the issue before us is not entirely free from doubt, we conclude on the basis of the facts and circumstances of this case that petitioner's participation in the activities of its growers was sufficient to constitute it a "farmer," and accordingly it may use the cash receipts and disbursements method of accounting in respect of its ducks.

*Decision will be entered under Rule 155.*

---

[16] Respondent's reliance on the unexplained reference to profit-sharing in *United States v. Chemell,* 243 F.2d 944 (5th Cir. 1957), is beside the point. If one examines the arrangement that actually existed in that case, it is apparent that the Circuit Court of Appeals was referring to the grower's participation in the taxpayer's profit on the subsequent sales, not vice versa. We interpret respondent's use of the phrase "for gain or profit" in secs. 1.61-4(d) and 1.175-3, Income Tax Regs., as providing the foundation for precluding losses on hobby farming and not as a basis for requiring a direct profit element in every stage of what is clearly a farming business.