T.C. Memo. 2004-185

UNITED STATES TAX COURT

HERBERT C. HAYNES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11304-01.                    Filed August 18, 2004.

<u>Fred R. Becker</u> and <u>Shawn P. Travis</u>, for petitioner.

<u>Mary P. Hamilton</u>, for respondent.

MEMORANDUM OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes as follows:  (1) For the tax
year ending May 31, 1995 (FYE 1995), $1,269,108;[1] (2) for the tax

---

[1]  All amounts are rounded to the nearest dollar.  All
section references are to the Internal Revenue Code in effect for
the years in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

year ending May 31, 1996 (FYE 1996), $527,216; and (3) for the tax year ending May 31, 1997 (FYE 1997), $718,914.

After concessions,[2] the issue for decision is whether respondent abused his discretion by requiring petitioner to change its method of accounting from the cash receipts and disbursements method of accounting (cash method) to the accrual method of accounting (accrual method). Subsumed in this issue is the question of whether petitioner is required to maintain inventories for tax purposes.

## Background

The parties submitted this case fully stipulated pursuant to Rule 122. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner's principal place of business was in Winn, Maine.

## Herbert C. Haynes, Inc.

Petitioner is a closely held Maine corporation engaged in the logging business. Petitioner was incorporated in 1963. Before incorporation, Herbert C. Haynes, Sr. operated the logging business as a sole proprietorship. Herbert C. Haynes, Sr., president and founder of petitioner, is the majority shareholder of petitioner. He owned between 97 and 89 percent of the stock

---

[2] The parties filed a stipulation of settled issues resolving all other issues.

during the years in issue.  The other shareholders are Virginia Haynes--wife of Herbert C. Haynes, Sr. --and Herbert C. Haynes, Jr., Ginger Haynes Maxwell, and Barbara Haynes French, children of Herbert C. Haynes, Sr.  Herbert C. Haynes, Jr., is the vice president of petitioner.  He holds a degree in forestry.  Ginger Haynes Maxwell is the secretary-clerk of petitioner.  Virginia Haynes is the treasurer of petitioner.

During the years in issue, petitioner employed approximately 60 employees.  Herbert C. Haynes, Sr., and his three children are full-time employees of petitioner.  Three employees of petitioner hold degrees in forestry.  Petitioner employed log purchasers, truck drivers, mechanics, bulldozer operators, excavators, and office staff.

Petitioner's Woodland Ownership

During the years at issue, petitioner owned at least 26,000 acres of woodland in Maine.  Additionally, Herbert C. Haynes, Sr., individually owned approximately 13,000 acres of woodland in Maine.  Lakeville Shores, Inc., a corporation owned 100 percent by Haynes children, and Five Islands Land Co., a corporation owned 100 percent by Herbert C. Haynes, Sr., also owned woodland in Maine.[3]  Petitioner maintains that its shareholders and the corporations owned by petitioner and by petitioner's shareholders

---

[3]  Haynes Oil Co. is a fully owned subsidiary of petitioner. Winn Logging, Inc., is a corporation owned by the Haynes children.  These corporations do not own woodland.

(collectively, related entities) owned approximately 110,000 acres of woodland in Maine and other States.

Petitioner's Business Activities

Most of petitioner's business activities relate to the cutting of timber[4] and transporting the resulting "wood product"[5] (logs or wood) to the appropriate mills. Petitioner supervised the cutting of timber on its own land and on land owned by others.

Petitioner had contracts and arrangements with approximately 100 mills. Under the contracts and arrangements, petitioner agreed to deliver logs to the mills for an agreed-upon price. These mills were located in Maine, Vermont, New Hampshire, Quebec, and New Brunswick.

For example, in petitioner's contract with International Paper Co., petitioner agreed to sell specified quantities of logs and wood (such as pulpwood, sawtimber, poles, and piling) to International Paper Co. for a set price. The duration of the contract was 6 months, divided into six 1-month order intervals.

---

[4] The parties define "timber" as standing trees containing wood available and suitable for marketing and use. "Hardwood" is defined as broadleaved, deciduous trees. "Softwood" is defined as trees that have needles, such as pine, spruce, and fir. "Stumpage" is defined as a standing tree, and "stumpage value" is defined as the "economic value of standing trees". "Pulpwood" is defined as "paper wood" or "smaller timber that is chipped up and used primarily to make paper".

[5] Once timber is cut, it becomes a "wood product".

International Paper Co. would issue a wood delivery order and/or a log delivery order within 1 week of the interval to petitioner. The order specified the species, volume, delivery points, and other specifications for deliveries to be made each week during the interval. International Paper Co. or its designee scaled or weighed all wood delivered by petitioner upon delivery. International Paper Co. had the right to refuse to accept delivery of all or a portion of the wood if it did not meet the specifications agreed to in the contract.

Petitioner supplied the mills with logs through various business activities. These included: (1) Cutting timber on land owned by petitioner or related entities; (2) cutting timber on land owned by third parties--i.e., landowners not related to petitioner, petitioner's shareholders, petitioner's subsidiaries, or petitioner's shareholders' corporations (collectively, unrelated entities); and (3) purchasing wood from unrelated entities. Petitioner generally received payment for logs within 2 to 4 weeks of delivery.

The trees cut by petitioner grew at a rate of 3 percent per year. It takes 30 to 50 years for these trees to reach maturity. Petitioner's business activities did not include the planting of new trees. Petitioner was not in the business of operating a nursery or sod farm. Petitioner was not in the business of

raising or harvesting trees bearing fruit, nuts, or other crops or ornamental trees.

1.   Timber Cut on Land Owned by Petitioner or Its Related Entities

A portion of petitioner's business activities related to cutting timber on land owned by petitioner or its related entities.  For this portion of petitioner's business activity, petitioner's foresters examined tracts of land to cut, marked trees to cut, and supervised cutting.  The crews that cut the trees were not employees of petitioner; they were employed by corporations under contract to petitioner.  The corporations petitioner hired to cut the trees were either related entities (such as Winn Logging, Inc.) or unrelated entities.  Trucks and other heavy equipment owned by or leased to petitioner transported the cut logs to mills designated by petitioner.

2.   Timber Purchase Arrangements With Unrelated Entities

A second business activity involved petitioner's timber purchase arrangements with unrelated entities that owned woodland.  Under these contracts, petitioner's foresters (or the landowner's foresters) identified the merchantable timber and oversaw the cutting crews.  Petitioner's trucks delivered the logs to mills that petitioner had contractual arrangements with. Petitioner used either one of two pricing arrangements under these timber purchase contracts:  (1) Fixed-price or lump-sum arrangements; or (2) "pay-as-cut" or stumpage permits.

### a.   Fixed-Price Arrangements

In a fixed-price or a lump-sum arrangement, petitioner paid a fixed price or a lump sum to cut timber for a fixed period. Petitioner assumed the risk of loss if the land produced an insufficient yield of timber.

### b.   "Pay-as-Cut" Arrangements

In a pay-as-cut or stumpage permit arrangement, petitioner paid the landowner for the timber as it was cut.  Foresters identified the timber to cut, and petitioner's foresters oversaw the cutting crews.

Although petitioner's contractual arrangements for purchasing timber varied, petitioner's typical stumpage permit granted petitioner the right to cut timber on a designated parcel of land.  Petitioner paid the landowner for the logs at the time of cutting.  The stumpage permit granted petitioner the right to enter the property with labor and equipment to cut and remove the timber.  Petitioner indemnified and held harmless the landowner from all liabilities, claims, judgments, or liens associated with its work on the premises.  Petitioner also covenanted to observe all Federal, State, and local laws, ordinances, and regulations relating to the cutting of forest products and the removal of all products and related waste from the premises.

Petitioner obtained stumpage permits from major timber landowners such as J.M. Huber Corp., Great Northern Paper Co.,

and International Paper Co., and from smaller landowners.  For stumpage permits with major timber landowners, the landowner's foresters identified the trees to be cut.  For stumpage permits with smaller landowners, petitioner's foresters identified the trees to be cut.

### 3.   Financing Arrangements

As another business activity, petitioner entered into purchase financing arrangements with unrelated entities.  Under these arrangements, petitioner lent the unrelated entity funds to purchase woodland.  The unrelated entity paid interest to petitioner, gave petitioner a security interest in the land and logs, and sold the logs to petitioner.  Petitioner's foresters or log buyers surveyed the property and identified and priced the marketable timber.  In some arrangements, petitioner hired cutting crews.  In other instances, petitioner merely identified and purchased the marketable timber and then sold and delivered it to the mill.

### 4.   Cutting Agreements With Unrelated Landowners

Petitioner also derived revenue from cutting agreements with unrelated landowners.  Under these cutting agreements, a landowner hired petitioner to cut and transport timber to the mills designated by the landowner.  The landowner paid petitioner a fixed rate per unit delivered.

5.   Purchased Wood

Another business activity petitioner engaged in involved logs that petitioner purchased and then resold.  Petitioner had no involvement in the cutting of the logs under this business activity.  Petitioner purchased the cut logs from an unrelated entity.  The unrelated entity delivered the logs to mills petitioner designated.  The mills purchased the logs from petitioner under an existing contract petitioner had with the mill.  The mill paid petitioner for the logs.  Petitioner then paid the unrelated entity for the logs, at a price less than what the mill paid petitioner.

6.   Petitioner's Estimated Costs From Its Business Activities

The parties stipulated the following:

Because of the scope of petitioner's activities and the entrepreneurial nature of the industry, it is impossible to describe a single business model. Further, the extent of petitioner's activities * * * will vary from year [to year] and involve many unique transactions.

Petitioner estimates the direct costs associated with the various business activities as follows:

| Business Activity | FYE 1995 | FYE 1996 | FYE 1997 |
|---|---|---|---|
| Trees from petitioner's land | $12,333,559 | $12,136,789 | $9,050,143 |
| Trees from related party land | 24,667,118 | 24,273,578 | 22,647,858 |
| Trees from unrelated party land | 12,333,559 | 12,136,789 | 13,588,715 |
| Subtotal | 49,334,236 | 48,547,156 | 45,286,716 |
| Purchased wood | 23,099,969 | 18,079,103 | 28,757,169 |
| Total | 72,434,205 | 66,626,259 | 74,043,885 |

As a percentage, petitioner estimates the direct costs associated with the various business activities as follows:

| Business Activity | FYE 1995 | FYE 1996 | FYE 1997 |
|---|---|---|---|
| Trees from petitioner's land | 17% | 18% | 12% |
| Trees from related party land | 34 | 36 | 31 |
| Trees from unrelated party land | 17 | 18 | 18 |
| Subtotal | 68 | 73 | 61 |
| Purchased wood | 32 | 27 | 39 |
| Total | 100 | 100 | 100 |

## Financial Accounting

The firm of Haverlock, Estey & Curran prepared petitioner's financial statements for FYE 1995, FYE 1996, and FYE 1997. The financial statements note, in the first footnote, that "The company * * * is on the cash basis of accounting for financial statement and tax reporting. Consequently, accounts payable, receivable and inventory are not recognized in these statements. The estimated figures for each * * * are as follows:"

| | FYE 1995 | FYE 1996 | FYE 1997 |
|---|---|---|---|
| Accounts receivable | $1,576,000 | $3,200,000 | $3,500,000 |
| Accounts payable | --- | --- | --- |
| Inventory[1] (cost, FIFO) | 1,862,892 | 1,477,361 | 1,862,892 |

[1] The parties agree that if respondent prevails and petitioner is required to maintain inventories, the closing inventory figures are as follows: (1) For FYE 1995, $1,862,892; (2) for FYE 1996, $610,950; and (3) for FYE 1997, $587,334.

## Income Tax Returns

On petitioner's Forms 1120, U.S. Corporation Income Tax Return, for the years at issue, petitioner listed its business activity as "wood operator" and its product or service as "pulpwood and logs". Since its inception, and including the years at issue, petitioner has maintained its books and records

and filed its Federal income tax returns using the cash method.
For FYE 1995, petitioner had gross receipts of $82,693,253 and
cost of operations of $78,340,960.  For FYE 1996, petitioner had
gross receipts of $76,677,330 and cost of operations of
$72,745,121.  For FYE 1997, petitioner had gross receipts of
$86,123,392 and cost of operations of $81,561,495.

## Discussion

### I.  Evidentiary Issue

Attached to petitioner's opening brief are exhibits which
were not included in the stipulation of facts and exhibits
submitted pursuant to Rule 122.  Petitioner's requests for
findings of fact and argument refer to these exhibits.

The submission of a case without trial under Rule 122(a)
does not alter the requirements otherwise applicable to adducing
proof.  Rule 122(b).  Statements in briefs do not constitute
evidence.  Rule 143(b); Evans v. Commissioner, 48 T.C. 704, 709
(1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969); Chapman
v. Commissioner, T.C. Memo. 1997-147; Berglund v. Commissioner,
T.C. Memo. 1995-536.  Accordingly, the additional exhibits
attached to petitioner's briefs are not part of the record and
will not be considered by the Court.

### II.  Burden of Proof

Petitioner appears to argue that respondent bears the burden
of proof on the issue of whether petitioner must maintain

inventories. Petitioner argues that this issue is a "new matter" not contained in the notice of deficiency. Our resolution of this case does not depend on which party bears the burden of proof. Nonetheless, for the sake of completeness, we will address this issue.

Petitioner bears the burden of establishing that respondent's determinations of deficiencies, as contained in the statutory notice of deficiency, are incorrect. See Rule 142(a);[6] Welch v. Helvering, 290 U.S. 111 (1933).

The notice of deficiency states:

Schedule A-1
Explanation of Adjustments

| | | | |
|---|---|---|---|
| a. | Change of Accounting Method | 5/31/95 | $1,576,300.00 |
| | | 5/31/96 | $1,623,700.00 |
| | | 5/31/97 | $300,000.00 |

The cash receipts and disbursements method of accounting you used to keep your books and records does not clearly reflect income; but the accrual method of accounting clearly reflects your income. Therefore, your taxable income is increased $1,576,300.00, $1,623,700.00 and $300,000.00 for 5/31/95, 5/31/96 and 5/31/97, respectively.

| | | | |
|---|---|---|---|
| b. | Cost of Sales | 5/31/95 | $1,862,892.00 |
| | | 5/31/96 | ($1,862,892.00) |
| | | 5/31/97 | ($1,477,361.00) |

Since you are being required to use the accrual method of accounting, the values of your opening and closing inventories for the tax year ending 5/31/95 is $0.00 and $1,862,892.00. For the tax year ending 5/31/96, your opening and closing inventories are $1,862,892 and $1,477,361.00. For the tax year ending 5/31/97, your opening and closing inventories are $1,477,361.00 and $2,419,747.

---

[6] The examination in this case commenced before July 22, 1998. Accordingly, sec. 7491 is inapplicable. See Warbelow's Air Ventures, Inc. v. Commissioner, 118 T.C. 579, 582 n.8, (2002), affd. 80 Fed. Appx. 16 (9th Cir. 2003).

c.  Cost of Sales      5/31/96  $1,477,361.00
             5/31/97  $2,419,747.00

  Since you are being required to use the accrual method of accounting, the values of your opening and closing inventories for the tax year ending 5/31/95 is $0.00 and $1,862,892.00.  For the tax year ending 5/31/96, your opening and closing inventories are $1,862,892 and $1,477,361.00.  For the tax year ending 5/31/97, your opening and closing inventories are $1,477,361.00 and $2,419,747.

[Emphasis added.]

The language regarding the adjustments to the cost of sales specifically refers to the value of petitioner's inventories. We find respondent determined in the notice of deficiency that petitioner is required to maintain inventories.  This is not a new issue.

III. Whether Petitioner's Accounting Method Clearly Reflects Income

  A.  Applicable Law

Respondent asserts that the cash method does not clearly reflect petitioner's income.  Under section 446,[7] the

---

[7] Sec. 446 provides in pertinent part:

  SEC. 446(a).  General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

  (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

  (c) Permissible Methods.--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting--
                (continued...)

Commissioner has broad powers to determine whether an accounting method used by a taxpayer clearly reflects income.  See Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995).  Courts do not interfere with the Commissioner's determination under section 446 unless it is clearly unlawful.  See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); Cole v. Commissioner, 586 F.2d 747, 749 (9th Cir. 1978), affg. 64 T.C. 1091 (1975); Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 370.

Whether respondent abused his discretion is a question of fact.  See Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371; Ford Motor Co. v. Commissioner, 102 T.C. 87, 91-92 (1994), affd. 71 F.3d 209 (6th Cir. 1995).  The reviewing court's task is not to determine whether, in its own opinion, the taxpayer's method of accounting clearly reflects income but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it does not.  See Ansley-Sheppard-Burgess Co. v.

---

[7](...continued)

      (1) the cash receipts and disbursements method;

      (2) an accrual method;

      (3) any other method permitted by this chapter; or

      (4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

- 15 -

Commissioner, supra at 371.  Consequently, to prevail, a
taxpayer must prove that the Commissioner's determination is
arbitrary, capricious, or without sound basis in fact or law.
See id.; Ford Motor Co. v. Commissioner, supra at 92.

To resolve this dispute, we consider sections 446 and 471
and the regulations thereunder.  Under section 446(a), a
taxpayer computes taxable income on the basis of the method of
accounting it uses in keeping its books.  Section 446(c)
describes the various accounting methods that a taxpayer may use
in computing taxable income, including the cash and accrual
methods.

Section 1.446-1(c)(2)(i), Income Tax Regs., provides that a
taxpayer who is required to use inventories must also use the
accrual method with regard to purchases and sales.  Under
section 471 and section 1.471-1, Income Tax Regs., a taxpayer
must account for inventories if the production, purchase, or
sale of merchandise is an income-producing factor in the
taxpayer's business and the taxpayer has acquired title to the
merchandise.

We consider the facts and circumstances of each case in
deciding whether an item is merchandise that is an income-
producing factor.  See Honeywell, Inc. v. Commissioner, T.C.
Memo. 1992-453, affd. without published opinion 27 F.3d 571 (8th

Cir. 1994); <u>Wilkinson-Beane, Inc. v. Commissioner</u>, T.C. Memo. 1969-79, affd. 420 F.2d 352 (1st Cir. 1970).

B.    <u>Whether Petitioner Must Maintain Inventory</u>

Respondent contends that, because the logs and wood are merchandise that is an income-producing factor in petitioner's business, petitioner must maintain inventories and report its taxable income under the accrual method.

Petitioner failed to respond in its reply brief to respondent's arguments regarding this issue.  In its opening brief petitioner argues that the purchased wood is not inventory because petitioner does not possess title to it.  Petitioner's only statement on this issue is:

> It seems reasonably far-fetched to contend that a person that harvests trees on land not owned by Petitioner and delivers them to a mill under Petitioner's contract, which Petitioner first learns about when it is presented a scale slip, somehow resulted in Petitioner receiving title to a log that is probably pulp before Petitioner's obligation to pay arises.  Indeed, we are unsure what this inventory argument truly brings to the clear reflection of anything since the "inventory" seems to be sold before it is received and the Petitioner never has the risk of loss or the benefits and burdens of ownership.

For the reasons stated below, we agree with respondent that petitioner maintains inventory and must use the accrual method.

1.    <u>Purchase, Production, or Sale</u>

It is undisputed that petitioner purchases the purchased wood.  Petitioner then resells the purchased wood to the mills. Additionally, in evaluating the substance of the transactions,

we believe petitioner bought wood in its other business activities as well. Petitioner's activities related to cutting wood on land owned by unrelated entities, under the numerous business activities such as the fixed price arrangements and pay-as-cut arrangements, are also forms of purchasing wood products for resale. Petitioner "bought" the timber (standing trees) on the unrelated entity's land, supervised cutting of the timber, removed the logs using its own equipment and trucks, and delivered the logs to the mills.

### 2. Merchandise

The logs and other wood products are merchandise to petitioner. Although not specifically defined in the Internal Revenue Code or the regulations, courts have ruled that "merchandise", as used in section 1.471-1, Income Tax Regs., is an item acquired and held for sale. See, e.g., Wilkinson-Beane, Inc. v. Commissioner, supra. Whether an item was acquired and held for sale is governed by the substance of the transaction and not its form. Honeywell, Inc. v. Commissioner, supra. Thus, to determine whether an item is "merchandise", we must take into account the particular facts and circumstances of the taxpayer in each case and the manner and context in which the taxpayer operates the business at hand. Wilkinson-Beane, Inc. v. Commissioner, supra; Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292; Honeywell, Inc. v. Commissioner, supra;

J.P. Sheahan Associates v. Commissioner, T.C. Memo. 1992-239.
Possession of title to goods, even if only for an instant, is
sufficient to require a taxpayer to inventory the goods.
Addison Distrib. Inc. v. Commissioner, T.C. Memo. 1998-289;
Middlebrooks v. Commissioner, T.C. Memo. 1975-275; see also sec.
1.471-1, Income Tax Regs.

Petitioner stipulated that it acquired the purchased wood.
Petitioner stipulated that it sold the purchased wood it
acquired.  We have also found that petitioner bought and sold
the wood it cut on land owned by unrelated entities.  The terms
of a typical contract between petitioner and a mill state:

> For the period and upon the terms and conditions
> hereinafter set forth, SELLER undertakes and agrees to
> sell and deliver unto PURCHASER, and PURCHASER
> undertakes and agrees to purchase and accept from
> SELLER, those certain quantities of pulpwood,
> sawtimber, poles and piling (herein called "wood") as
> are hereinafter more particularly set forth and
> described.

Petitioner obtains title to the wood before it sells it to
the mills.  See Me. Rev. Stat. Ann. tit. 11, sec. 2-401 (West
1995) (passage of title).  For petitioner to purchase and resell
the wood, title had to pass from the logger who cut the wood to
petitioner and then from petitioner to the mill.  See also
Tebarco Mech. Corp. v. Commissioner, T.C. Memo. 1997-311.

Petitioner's income tax returns indicate that its product
or service was "pulpwood and logs".  The logs are not consumed
by petitioner in its business.  Petitioner has not asserted that

it is in a service business or that the logs are incidental to its business activity. To the contrary, petitioner is in the business of buying and selling logs.

The substance of the transactions demonstrates that petitioner acquired logs and wood and held them for sale.

### 3. Income-Producing Factor

In evaluating whether merchandise is an income-producing factor in a taxpayer's business, we compare the cost of the merchandise to the taxpayer's gross receipts computed under the cash method. See Wilkinson-Beane, Inc. v. Commissioner, supra. In Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352 (1st Cir. 1970), the Court of Appeals affirmed our holding that merchandise the cost of which (in different taxable years) constituted 14.7 percent and 15.4 percent of the taxpayer's gross receipts was a significant income-producing factor in the taxpayer's business. See also Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 790 (11th Cir. 1984) (wherein newspapers, the cost of which constituted 17.6 percent of the taxpayer's total revenues, were considered a material income-producing factor).

Here, the cost of the purchased wood was stipulated by the parties as $23,099,069, which is 28 percent of petitioner's gross receipts for FYE 1995; $18,079,103, which is 23.6 percent of petitioner's gross receipts for FYE 1996; and $28,757,169,

which is 33 percent of petitioner's gross receipts for FYE 1997. The business activity related to purchased wood was a substantial income-producing factor to petitioner.

Considering the cost of the purchased wood plus the business activities of cutting trees on land owned by unrelated entities, the cost of the wood that petitioner purchased was 43 percent of the gross receipts for FYE 1995 ($23,099,969 + $12,333,559), 39 percent of the gross receipts for FYE 1996 ($18,079,103 + $12,136,789), and 49 percent of the gross receipts for FYE 1997 ($28,757,169 + $13,588,715).

Considering wood that petitioner purchased from related entities, these percentages are even higher.

Accordingly, petitioner must maintain inventories and use the accrual method to account for purchases and sales. Petitioner's use of the cash method does not clearly reflect its sales income.

IV. Other Arguments Raised by Petitioner

Petitioner claims that it is a grower and harvester of trees. Petitioner argues that "the Code literally, explicitly, and intentionally permits a company that 'harvests' timber to use the cash method of accounting" and that respondent cannot force petitioner to change an accounting method specifically authorized by the Internal Revenue Code. Petitioner cites sections 447 and 448 in support of this argument.

A.   Section 447--Method of Accounting for Corporations
     Engaged in Farming

Section 447 provides that taxable income from farming of a corporation engaged in the trade or business of farming "shall be computed on an accrual method of accounting".  Sec. 447(a). Section 447, however, does not apply to the trade or business of harvesting trees that are not fruit or nut trees.  Id.  We agree with petitioner that section 447 does not require petitioner's use of the accrual method.

We disagree, however, that section 447 "literally, explicitly, and intentionally" permits petitioner's use of the cash method under the facts and circumstances presented. Section 447 sets forth conditions that require use of the accrual method, not authorization to use the cash method.

B.   Section 448–Whether Petitioner Is a
     "Farming Business"

Section 448 provides that a C corporation shall not compute its taxable income using the cash method.  Sec. 448(a)(1).  An exception exists for C corporations engaged in a "farming business."  Sec. 448(b)(1).  "Farming business" includes "the raising, harvesting, or growing" of timber.  Secs. 448(d)(1)(B), 263A(c)(5).  Timber includes "trees raised, harvested, or grown by the taxpayer" other than trees that bear fruit or nuts, and other than trees in a nursery.  Sec. 263A(c)(5), (e)(4).

Petitioner contends that it should be allowed to use the

cash method because section 448 does not bar it. "The fact that section 448 does not preclude petitioner from using the cash method does not authorize it if * * * the cash method does not clearly reflect income." Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292. When a taxpayer has inventories, the taxpayer may not use the cash method, even though so permitted under section 448, if the cash method does not clearly reflect its income. See id.

Indeed, the regulations under section 448 emphasize that other sections may limit a taxpayer's entitlement to use the cash method.

> Nothing in section 448 shall have any effect on the application of any other provision of law that would otherwise limit the use of the cash method, and no inference shall be drawn from section 448 with respect to the application of any such provision. For example, nothing in section 448 affects * * * the requirement of § 1.446-1(c)(2) that an accrual method be used with regard to purchases and sales of inventory. Similarly, nothing in section 448 affects the authority of the Commissioner under section 446(b) to require the use of an accounting method that clearly reflects income * * *. For example, a taxpayer using the cash method may be required to change to an accrual method of accounting under section 446(b) because such method clearly reflects that taxpayer's income, even though the taxpayer is not prohibited by section 448 from using the cash method. * * * [Sec. 1.448-1T(c), Temporary Income Tax Regs., 52 Fed. Reg. 22767 (June 12, 1987).]

We have found that petitioner must maintain inventories. Accordingly, the cash method does not clearly reflect petitioner's income. Section 448 does not "literally,

explicitly, and intentionally" permit petitioner's use of the cash method.

C.  Section 1.471-6(a), Income Tax Regs.--Whether Petitioner Is a "Farmer"

Petitioner cites various cases in which we held that the taxpayers were farmers and thus were entitled to use the cash method.  In Maple Leaf Farms, Inc. v. Commissioner, 64 T.C. 438 (1975), we held that a duck grower was entitled to use the cash method under section 1.471-6(a), Income Tax Regs.  We looked to other sections to determine whether the duck grower was a "farmer" and whether the place where the duck growing process occurred was a "farm" for purposes of section 1.471-6(a), Income Tax Regs.  Id. at 447 (citing sections 175(c)(2), 180(b), 182(c), and 6420(c)(2) and (3) and sections 1.61-4(d), 1.175-3, 1.180-1(b), and 1.182-2, Income Tax Regs.).  In Maple Leaf Farms, Inc., the facts evidenced that the taxpayer was integrally involved in the process of growing ducks it raised on its own property and in the process of growing ducks it supplied to independent growers.  Id.  The taxpayer also bore a substantial risk of loss.  Id. at 448.  Thus, the taxpayer's "participation in the activities of its growers was sufficient to constitute it a 'farmer' and accordingly it may use the cash receipts and disbursements method of accounting in respect of its ducks."  Id. at 452; see also sec. 1.471-6(a), Income Tax Regs.

In <u>Hi-Plains Enters., Inc. v. Commissioner</u>, 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974), and <u>Cameron v. Commissioner</u>, T.C. Memo. 1982-259, two cases decided before the enactment of section 447, we held that taxpayers who operated commercial feedlots were "farmers" and the feedlot was a "farm" under the Internal Revenue Code. The taxpayers were permitted to use the cash method pursuant to section 1.471-6(a), Income Tax Regs.

The facts of the aforementioned farming cases are distinguishable from the facts of this case. In the farming cases, the taxpayers engaged in the business activity of farming, as defined in sections 175(c)(2), 180(b), 182(c), and 6420(c)(2) and (3) and sections 1.61-4(d), 1.175-3, 1.180-1(b), and 1.182-2, Income Tax Regs. Section 1.471-6(a), Income Tax Regs., permits taxpayers who meet the definition under these sections to use the cash method. See <u>Maple Leaf Farms, Inc. v. Commissioner</u>, <u>supra</u> at 447.

Unlike the taxpayers in <u>Maple Leaf Farms, Inc.</u>, <u>Hi-Plains Enters., Inc.</u>, and <u>Cameron</u>, petitioner does not operate a "farm", and its business activities do not meet the definition of "the business of farming" or "farming" under these sections. For example, in section 175(c)(2), which the Court cited in <u>Maple Leaf Farms, Inc.</u>, "land used in farming" means "land used * * * by the taxpayer or his tenant for the production of crops,

fruits, or other agricultural products, or for the sustenance of livestock." Under the facts of this case, petitioner does not use the woodland it owns to produce crops, fruits, or other agricultural products. Likewise, in sections 1.182-2 and 1.175-3, Income Tax Regs., "A taxpayer is engaged in the business of farming if he cultivates, operates, or manages a farm for gain or profit * * * A taxpayer engaged in forestry or the growing of timber is not thereby engaged in the business of farming."[8] Indeed, these regulations specifically exclude petitioner from the definition of "business of farming" for purposes of those sections.

Petitioner engages in a variety of business activities. Petitioner's business activities do not qualify petitioner as a "farmer" for purposes of section 1.471-6(a), Income Tax Regs. Further, some of petitioner's business activities specifically require it to maintain inventories. Thus, section 1.471-6(a), Income Tax Regs., does not permit petitioner's use of the cash method under the facts and circumstances presented herein.

---

[8] We note that the other sections cited in Maple Leaf Farms, Inc. v. Commissioner, 64 T.C. 438 (1975), provide similar definitions for "farming" and "the business of farming". Petitioner does not meet these definitions either. See secs. 180(b), 6420(c)(2) and (3); secs. 1.61-4(d), 1.180-1(b), Income Tax Regs.

D.    Use of Both Cash and Accrual Methods

Petitioner argues that it should be permitted to use the cash method for the business activity of cutting trees on its own land.  "Where a taxpayer has two or more separate and distinct trades or businesses, a different method of accounting may be used for each trade or business, provided the method used for each trade or business clearly reflects the income of that particular trade or business."  Sec. 1.446-1(d)(1), Income Tax Regs.  "No trade or business will be considered separate and distinct * * * unless a complete and separable set of books and records is kept for such trade or business."  Sec. 1.446-1(d)(2), Income Tax Regs.

Petitioner does not maintain separate businesses or separate books and records for its various business activities.  Indeed, petitioner stipulated:  "Because of the scope of petitioner's activities and the entrepreneurial nature of the industry, it is impossible to describe a single business model.  Further, the extent of petitioner's activities * * * will vary from year [to year] and involve many unique transactions."

Petitioner engages in various business activities.  In Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d at 355, the Court of Appeals for the First Circuit, the court to which an appeal of this case would lie, held that the taxpayer had to use the accrual method where its business involved providing funeral

services and supplying caskets for the funeral services.  In Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d at 790, the Court of Appeals for the Eleventh Circuit held that a newspaper that provided the service of presenting information to its readers had to use the accrual method where the cost of newsprint and ink was 17.6 percent of the total cash receipts. In Ward AG Prods. v. Commissioner, T.C. Memo. 1998-84, affd. without published opinion 216 F.3d 1090 (11th Cir. 2000), we held that a taxpayer who operated a business that sold farming seed, fertilizer, and equipment and provided certain services to farmers was not a farming business and had to maintain inventories and use the accrual method.

Some of petitioner's business activities involve no growing of trees, no harvesting of trees, and no ownership of the land on which the trees are grown.  Other business activities involve a combination of the above.  The business activities related to buying and selling wood generate merchandise for petitioner. The merchandise is an income-producing factor to petitioner. Thus, the facts and circumstances of this case are analogous to those described in Wilkinson-Beane, Inc. and Knight Ridder Newspapers.

Petitioner must use the accrual method of accounting for all of its business activities.  See Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.[9]

Decision will be entered

under Rule 155.

---

[9] We note that secs. 611 and 631 and the regulations thereunder contain special rules of accounting for the timber industry.  See secs. 611, 631; sec. 1.611-3, Income Tax Regs. (relating to cost depletion of timber), sec. 1.631-1, Income Tax Regs. (creating an election to consider the cutting of timber as a sale or exchange); see also RLC Indus. Co. v. Commissioner, 98 T.C. 457 (1992) (analyzing taxpayer's method of computing timber depletion under sec. 611), affd. 58 F.3d 413 (9th Cir. 1995).

Neither party argued in its briefs that these code sections are dispositive of the issues presented in this case. Additionally, neither party addressed the interplay of these code sections with secs. 447 and 448, or the rules regarding inventory in the regulations under secs. 611 and 631.  Accordingly, we will not address these issues.

We note that while petitioner mentioned sec. 631(a) in passing in its reply brief, petitioner did not raise the aforementioned issues.  Furthermore, we will not consider issues that are raised for the first time in a reply brief.  See Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).